# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PLUMBERS' WELFARE FUND, LOCAL 130 U.A.<br><br>                 Plaintiff,<br><br>      v.<br><br>EXPRESS SCRIPTS, INC., EVERNORTH HEALTH SERVICES, and THE CIGNA GROUP<br><br>               Defendants. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED<br><br>**<u>COMPLAINT</u>** |

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................... 1

II.   JURISDICTION AND VENUE ............................................................. 6

III.  PARTIES ................................................................................................ 7

     A.    Plaintiff ........................................................................................ 7

     B.    Defendants .................................................................................... 8

     C.    Relevant Non-Party Cigna Entity ............................................... 8

     D.    Non-Party Drug Companies Participating in the PBM Fraud Enterprises ............ 9

IV.  THE FORMULARY MANIPULATION SCHEME ............................... 14

     A.    Recent Investigations Revealed the Formulary Manipulation Scheme ............... 14

     B.    Express Scripts' Role as a PBM ................................................ 16

     C.    Express Scripts' Contracts with Plumbers' Welfare Fund and the Class ............ 22

     D.    Defendants Created Ascent, a Fake Foreign GPO, to Implement the Formulary Manipulation Scheme ......................................... 23

     E.    During the Class Period, Defendants' Formulary Manipulation Scheme Extracted Billions of Dollars in Bribes and Kickbacks to Ascent ....................... 28

     F.    Express Scripts Manipulated Formularies In Exchange For The Kickbacks Drug Companies Paid To Ascent ......................... 35

V.   DEFENDANTS FALSELY PORTRAY THEMSELVES LOWERING DRUG COSTS FOR ESI'S PBM CLIENTS ................................ 40

     A.    Misrepresentations By Express Scripts' Executives and Spokespersons ............ 41

     B.    Misrepresentations On Express Scripts' Website ...................... 45

     C.    Misrepresentations On Evernorth's Website ............................. 46

     D.    Express Scripts Falsely Told Plumbers' Welfare Fund and Other ESI PBM Customers That Its Formulary and Rebate Decisions Were Based on Helping Customers Control Costs and Achieve Significant Savings ............... 50

VI.    DEFENDANTS HAVE ESTABLISHED AND OPERATED RICO
       ENTERPRISES IN FURTHERANCE OF THEIR FRAUDULENT SCHEME ............. 55

       A.    In Furtherance of Defendants' Fraudulent Scheme, Each of the PBM
             Fraud Enterprises Made False and Misleading Statements ................................. 62

VII.   EXPRESS SCRIPTS BREACHED ITS OBLIGATION TO TREAT ITS PBM
       CUSTOMERS FAIRLY AND IN GOOD FAITH ........................................................... 63

VIII.  CLASS-ACTION ALLEGATIONS ................................................................................. 64

IX.    CLAIMS FOR RELIEF ................................................................................................... 67

COUNT I ...................................................................................................................................... 67

COUNT II ..................................................................................................................................... 74

COUNT III .................................................................................................................................... 76

COUNT IV .................................................................................................................................... 77

COUNT V ...................................................................................................................................... 78

X.     PRAYER FOR RELIEF ................................................................................................... 79

XI.    JURY DEMAND ............................................................................................................... 80

Plumbers' Welfare Fund, Local 130 U.A. ("Plumbers' Welfare Fund" or "Plaintiff"), a multiemployer plan as defined under 29 U.S.C. §1002(37), and the putative class members are pharmacy benefit manager ("PBM") customers of Defendant Express Scripts, Inc. ("Express Scripts" or "ESI"). Individually and on behalf of the other members of the ESI PBM customer class (the "Class"), Plumbers' Welfare Fund alleges, upon personal knowledge as to itself and its own acts, and as to all other matters based on investigation of counsel and upon information and belief, the following against Defendants Express Scripts, Evernorth Health Services ("Evernorth"), and The Cigna Group ("Cigna," collectively with Express Scripts and Evernorth, "Defendants"):

## I.       NATURE OF THE ACTION

1.       Express Scripts describes itself as "the largest manager of pharmacy benefits in the United States." Each year, ESI PBM customers, including Plumbers' Welfare Fund and the Class, pay billions of dollars to Express Scripts for its pharmacy benefit management services.

2.       Express Scripts has reached the pinnacle of the PBM industry by promising to drive down prescription drug costs for its PBM customers by negotiating rebates from drug companies and managing drug formularies.

3.       A formulary is a list of drugs covered by a prescription plan. Express Scripts controls these formularies and determines which drugs are available to PBM customers, assuring clients that its standard formularies are designed to lower costs. Even when customers participate in formulary decisions, Express Scripts retains control over rebate negotiations and formulary restrictions.

4.       Specifically, Express Scripts promised Plumbers' Welfare Fund, and other Express Scripts PBM customers, that it would provide significant cost savings by negotiating with drug companies on their behalf to secure rebates to reduce the cost of drugs, and through "ongoing

formulary management" such as promptly replacing high-cost drugs with low-cost equivalents on Express Scripts standard formularies.

5.      In truth, Express Scripts and its corporate parents, Defendants Cigna, and Evernorth, together with non-party Cigna entity Ascent Health Services ("Ascent") and non-party drug companies, orchestrated an elaborate, fraudulent scheme to sell access to the drug formularies used by its PBM customers (the "Formulary Manipulation Scheme").  As part of this conspiracy, Express Scripts manipulated its formularies to give access and preferential placement to high-cost brand drugs.  Defendants implemented this scheme by using Express Scripts' negotiating power to convince drug companies to divert exorbitant "fees" to Ascent, which traditionally would have been considered rebates and passed on to Express Scripts' PBM customers, like Plumbers' Welfare Fund and the Class.  This scheme maximizes Defendants' profits while limiting ESI PBM customers' access to their contractually-guaranteed rebates and driving up ESI PBM customers' prescription drugs costs instead of reducing such costs.

6.      The Formulary Manipulation Scheme breaches a core term of Express Scripts' standard contract with Plumbers' Welfare Fund and the Class: that any "[c]ompensation derived through [affiliated] business segments is not considered for PBM formulary placement." Defendants further breached the implied covenant of good faith and fair dealing inherent in the contracts that governed Express Scripts' provision of services to Plumbers' Welfare Fund and the Class, and unjustly enriched themselves to the financial detriment of Plumbers' Welfare Fund and the Class.

7.      From April 15, 2019, the date of Ascent's creation, to the present (the "Class Period"), Defendants have withheld billions of dollars from Express Scripts' PBM customers by exchanging preferred formulary placement and formulary access in return for kickback payments

2

from drug companies, and then mislabeling these kickback payments as fees to avoid sharing rebates with PBM customers, as contractually required. Rather than negotiating to maximize the rebates to be shared with ESI PBM customers—the primary mechanism by which Express Scripts promised to deliver lower drug costs for the Class—Defendants instead used their control over Express Scripts' formularies to direct drug companies to make payments to Ascent, Express Scripts' sister company. Defendants falsely label these unlawful bribes and kickbacks as "rebate administration" and other "*bona fide* service" fees for Ascent.

8. Defendants have been able to orchestrate the Formulary Manipulation Scheme by leveraging the negotiating power that Express Scripts has over drug companies because of its control over the drug formularies used by Plumbers' Welfare Fund and the Class. Instead of using this power to serve the interests of ESI PBM customers as Express Scripts promised, Defendants abused their leverage to further their own financial interest to the detriment of the ESI PBM customers.

9. The Formulary Manipulation Scheme began in response to pressure applied by ESI PBM customers for Express Scripts to share the entirety of the payments it received from drug companies irrespective of whether they are classified as rebates or by another label. Effective January 1, 2019, for example, Plumbers' Welfare Fund amended its prescription benefit management contract to require Express Scripts to pass on 100% of the rebates and administrative fees paid by drug companies.

10. In 2019, to evade having to share payments from drug companies with Plumbers' Welfare Fund and the Class, Defendants created Ascent, which is based in Switzerland and majority-owned and controlled by Cigna. The purported reason for creating Ascent was for it to take over the "rebate administration" tasks that Express Scripts had previously performed. This

3

included the responsibility for negotiating with drug companies to secure rebates, which is one of the primary tasks for which Plumbers' Welfare Fund and other ESI PBM customers hire Express Scripts as their PBM.

11.     Defendants and non-party Ascent then conspired with drug companies to have them pay exorbitant "rebate administration" fees and other service fees to Ascent in exchange for access to Express Scripts' formularies and favorable placement on those formularies.  The fees that Defendants extracted and demanded drug companies pay to Ascent vastly exceeded the fair market value of Ascent's services.  Those fees are, in actuality, bribes and kickbacks in return for Express Scripts giving formulary access and favorable formulary placements to high-price, brand-name drugs over competing drugs, to the detriment of Plumbers' Welfare Fund and the Class.

12.     Ascent, in short, functions as a conduit through which Defendants have collected exorbitant bribes and kickbacks without having to disclose those monies or share them with Express Scripts' PBM customers.  As Cigna's former Chief Medical Officer, Steve Miller, admitted in an interview, Ascent has enabled Defendants to "double, triple dip on fees" without the knowledge of Express Scripts' PBM customers.

13.     Plumbers' Welfare Fund, the Class, and the public did not and could not know of the Formulary Manipulation Scheme until the recent publication of a series of governmental reports and investigative journalism stories, including reports by the Office of Personnel Management Office of Inspector General ("OPM-OIG"), the Federal Trade Commission ("FTC"), and Congressional committees.  Indeed, to conceal the Formulary Manipulation Scheme from Plumbers' Welfare Fund and the Class, Express Scripts' "financial disclosure" to its PBM customers falsely asserts that the drug companies' payments to Ascent are "not considered for PBM formulary placement."

4

14.     To orchestrate the Formulary Manipulation Scheme, Defendants have controlled and operated a series of bilateral RICO enterprises (the "PBM Fraud Enterprises"). Each of the PBM Fraud Enterprises involved, on one side, the Defendants and non-party Ascent, and, on the other side, a drug company that paid bribes and kickbacks to Ascent in return for formulary access and favorable formulary placements for its drugs on ESI's formularies. During the Class Period, nearly every major drug company–including, but not limited to, AbbVie, Amgen, AstraZeneca, Bayer, Bristol-Myers Squibb, Boehringer Ingelheim, Eli Lilly, Gilead Sciences, Johnson & Johnson, Merck, Novartis, Novo Nordisk, Pfizer, and Sanofi–has participated in the bilateral PBM Fraud Enterprises.

15.     During the Class Period, each of the PBM Fraud Enterprises operated on the basis of agreements and understandings between Defendants, non-party Ascent, and the participating drug company. Specifically, Express Scripts sold drug companies access to its clients by giving formulary access and favorable formulary placement in return for bribes and kickbacks paid by drug companies to Ascent. This scheme enriched Defendants to the detriment of Plumbers' Welfare Fund and the Class.

16.     Defendants concealed these bribes and kickbacks by arranging for each drug company to funnel the payments to Ascent and misclassifying them as ostensibly legitimate fees, avoiding contractual obligations to share rebates. Payments from drug companies to Express Scripts itself are deemed "rebates" or "administrative fees" that must be shared with ESI PBM customers under their contracts with Express Scripts. By having the drug companies mislabel these bribes and kickbacks as other ostensibly legitimate "fees" paid to Ascent, Defendants avoided having the payments defined as "rebates" and "administrative fees" that they were

5

required to share with Plumbers' Welfare Fund and the Class. Instead, Defendants retained those payments to enrich themselves, to the direct detriment of Plumbers' Welfare Fund and the Class.

17. Defendants' operation of the PBM Fraud Enterprises has directly caused financial losses to Plumbers' Welfare Fund and the Class. *First*, Defendants' scheme of negotiating with drug companies for the payment of billions of dollars to Ascent, falsely labeled as service and other fees, has reduced by billions of dollars the payments that Plumbers' Welfare Fund and the Class received from Express Scripts as rebates. Instead of using their negotiating leverage to maximize the rebates secured for ESI PBM customers as they represented they would do, Defendants used that leverage to extract payments to Ascent for their own benefit.

18. *Second*, by selling formulary access and favorable formulary placements to high-price, brand-name drugs in return for bribes and kickbacks paid to Ascent, Defendants violated their contracts with ESI PBM customers and raised prescription drug costs for ESI PBM customers. Put simply, Plumbers' Welfare Fund and the Class have had to pay more to Express Scripts during the Class Period for prescription drug coverage for their beneficiaries as a result of the Formulary Manipulation Scheme.

19. Through this action, Plumbers' Welfare Fund and the Class seek to recover the excess costs imposed by the kickbacks that Defendants have fraudulently diverted to Ascent, the higher payments they have had to make to Express Scripts as result of its bribe and kickback tainted formulary placement decisions, and such other relief as authorized by law.

## II.     <u>JURISDICTION AND VENUE</u>

20. This Court has subject matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because Counts 1 and 2 arise under the laws of the United States and because Plaintiff was injured in its business and property by reason of a violation of 18 U.S.C. § 1962. This Court also has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28

U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5 million (exclusive of interest and costs) and is a class action in which at least one class member is a citizen of a state different from any defendant. Defendant Cigna is incorporated in Delaware and headquartered in Connecticut, and as such, is a citizen of both states. Defendant Express Scripts is incorporated in Delaware with its principal place of business in Missouri, and as such is a citizen of both states. Defendant Evernorth is incorporated in Delaware with its principal place of business in Missouri, and as such is a citizen of both states.

21.     This Court has personal jurisdiction over Plaintiff Plumbers' Welfare Fund because Plaintiff is based in Chicago, Illinois, and conducts its activities therein.

22.     This Court has personal jurisdiction over Defendants because all Defendants conducted and conduct extensive business in this District, including the pharmacy benefit management services and group purchasing organization services described herein.

23.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because Plaintiff is located in this District, and a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District. Defendants conducted business in this District during the Class Period.

24.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including wire communications.

## III.    PARTIES

### A.    Plaintiff

25.     Plaintiff Plumbers' Welfare Fund is a health and welfare fund that provides benefits for members of a union of plumbers and other building tradesmen, as well as retired union members and beneficiaries. Located in Chicago, Plumbers' Welfare Fund is a multiemployer plan,

as defined under 29 U.S.C. § 1002(37), organized under the state of Illinois. Plumbers' Welfare Fund is organized as a non-profit trust, which is sponsored and administered by a Board of Trustees and established through collective bargaining by labor unions and employers.

26.     Throughout the Class Period, Plumbers' Welfare Fund incurred significant costs paying Express Scripts for pharmacy benefit manager services and was injured by the conduct alleged in this Complaint.

**B.     Defendants**

27.     The Cigna Group ("Cigna") is a Delaware corporation and global healthcare company with a principal place of business at 900 Cottage Grove Road, Bloomfield, Connecticut 06002. It is the parent corporation of Evernorth, Express Scripts, and Ascent, defined below.

28.     Express Scripts, Inc. ("Express Scripts") is a PBM that manages pharmacy services for health plans, employers, and government agencies. It is a Delaware corporation, with its principal place of business at One Express Way, St. Louis, Missouri 63121. Express Scripts is a subsidiary of Evernorth Health, Inc., which is a wholly-owned subsidiary of Cigna. Express Scripts provides pharmacy benefit management services to various health insurance entities, including Plumbers' Welfare Fund and the Class.

29.     Evernorth Health Services ("Evernorth") is a wholly owned subsidiary of Cigna. In 2020, Cigna restructured by placing several subsidiaries under Evernorth and rebranding those business lines as "Evernorth." As relevant here, Evernorth is the corporate parent of Express Scripts and Ascent. According to its website, Evernorth offers health care services, including pharmacy, behavioral health, and benefits management.

**C.     Relevant Non-Party Cigna Entity**

30.     Ascent Health Services ("Ascent") is purportedly a group purchasing organization ("GPO") that negotiates rebates with drug companies on behalf of PBMs, including on behalf of

Express Scripts.  It was established in 2019 by Defendant Express Scripts and is a subsidiary of Defendant Cigna.  Ascent is a limited liability company organized under the laws of Delaware, with its principal place of business in Switzerland.  Ascent's ownership also includes two minority co-owners, Prime Therapeutics and Kroger, both of which have PBMs that also use Ascent's purported GPO services.

31.    The chart below indicates the relationships between Defendants and Relevant Non-Party Ascent:



Cigna Vertical Business Relationships:
PBM, GPO, and Provider

**D.    Non-Party Drug Companies Participating in the PBM Fraud Enterprises**

32.    AbbVie, Inc. ("AbbVie") is a corporation organized and existing under the laws of Delaware with a principal place of business at 1 North Waukegan Road, North Chicago, Illinois. AbbVie is a major drug company that manufactures and markets brand-name drugs including Humira, Linzess, Rinvoq, and Skyrizi.  During the Class Period, AbbVie regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment.  As a

participant in the PBM Fraud Enterprises, AbbVie made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

33.     Amgen, Inc. ("Amgen") is a corporation organized and existing under the laws of Delaware with a principal place of business at 1 Amgen Center Drive, Thousand Oaks, CA 91320. Amgen is a major drug company that manufactures and markets brand-name drugs including Enbrel, Repatha, and Otezla.  During the Class Period, Amgen regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, Amgen also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

34.     AstraZeneca PLC ("AstraZeneca") is a corporation organized and existing under the laws of England and Wales with a principal place of business for its United States operations at 1800 Concord Pike Wilmington, Delaware.  AstraZeneca is a major drug company that manufactures and markets brand-name drugs including Farxiga, Tagrisso, Symbicort, Lynparza, Brilinta, Calquence, and Lokelma.  During the Class Period, AstraZeneca regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, AstraZeneca also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

35.     Bayer AG ("Bayer") is a corporation organized and existing under the laws of Germany with a principal place of business for its United States operations at 100 Bayer Boulevard, Whippany, New Jersey.  Bayer is a major drug company that manufactures and markets brand-name drugs including Eylea, Kyleena, Nubeqa, Stivarga, Vitrakvi, and Xarelto.  During the Class Period, Bayer regularly interfaced with Express Scripts relating to coverage determination,

10

reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Bayer also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

36.     Bristol-Myers Squibb Co. ("BMS") is a corporation organized and existing under the laws of Delaware, with a principal place of business at 345 Park Avenue, New York, New York. BMS is a major drug company that manufactures and markets brand-name drugs including Abilify, Eliquis, Revlimid, Sprycel, and Zeposia. During the Class Period, BMS regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, BMS also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

37.     Boehringer Ingelheim ("Boehringer") is a corporation organized and existing under the laws of Germany with a principal place of business for its United States operations at 900 Ridgebury Road, Ridgefield, Connecticut. Boehringer is a major drug company that manufactures and markets brand-name drugs including Tradjenta, Jardiance, OFEV, Glyxambi, and Spiriva. During the Class Period, Boehringer regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Boehringer also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

38.     Eli Lilly and Company ("Eli Lilly") is a corporation organized and existing under the laws of Indiana with a principal place of business at 893 Delaware Street, Indianapolis, Indiana. Eli Lilly is a major drug company that manufactures and markets brand-name drugs including Humalog, Humulin, and Trulicity. During the Class Period, Eli Lilly regularly interfaced with

Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Eli Lilly also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

39. Gilead Sciences, Inc. ("Gilead") is a corporation organized and existing under the laws of Delaware with a principal place of business at 333 Lakeside Drive, Foster City, California. Gilead is a major drug company that manufactures and markets brand-name drugs including Biktarvy, Descovy, Harvoni, and Vosevi. During the Class Period, Gilead regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Gilead also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

40. Johnson & Johnson ("J&J") is a corporation organized and existing under the laws of New Jersey with a principal place of business at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey. J&J is a major drug company that manufactures and markets brand-name drugs including Tremfya, Stelara, Erleada, and Darzalex. During the Class Period, J&J regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, J&J also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

41. Merck & Co., Inc. ("Merck") is a corporation organized and existing under the laws of New Jersey with a principal place of business at 126 E Lincoln Ave, Rahway, New Jersey. Merck is a major drug company that manufactures and markets brand-name drugs including

Keytruda, Gardasil, Verquvo, Januvia, Steglujan, Zepatier, and Steglatro.  During the Class Period, Merck regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, Merck also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

42.     Novartis AG ("Novartis") is a corporation organized and existing under the laws of Switzerland with a principal place of business for its United States operations at 1 Health Plaza East, Hanover, New Jersey.  Novartis is a major drug company that manufactures and markets brand-name drugs including Gilenya, Entresto, Kesimpta, Jakafi, Tasigna, and Xolair.  During the Class Period, Novartis regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, Novartis also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

43.     Novo Nordisk A/S ("Novo Nordisk") is a corporation organized and existing under the laws of Denmark with a principal place of business for its United States operations at 800 Scudders Mill Road, Plainsboro, New Jersey.  Novo Nordisk is a major drug company that manufactures and markets brand-name drugs including Wegovy, Xultophy, Victoza, Ozempic, Tresiba, and Ryzodeg.  During the Class Period, Novo Nordisk regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment.  As a participant in the PBM Fraud Enterprises, Novo Nordisk also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

44.     Pfizer Inc. ("Pfizer") is a corporation organized and existing under the laws of Delaware with a principal place of business at 66 Hudson Boulevard East, New York, New York.

Pfizer is a major drug company that manufactures and markets brand-name drugs including Eliquis, Ibrance, Lipitor, Vyndaqel, Lyrica, and Xeljanz. During the Class Period, Pfizer regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Pfizer also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

45. Sanofi U.S. ("Sanofi") is a corporation organized and existing under the laws of Delaware, with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey. Sanofi is a major drug company that manufactures and markets brand-name drugs including Dupixent, Lantus, Soliqua, and Toujeo. During the Class Period, Sanofi regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment. As a participant in the PBM Fraud Enterprises, Sanofi also made payments to Ascent in exchange for access to Express Scripts' formularies and favorable formulary placements of its brand-name drugs.

## IV.    THE FORMULARY MANIPULATION SCHEME

### A.    Recent Investigations Revealed the Formulary Manipulation Scheme

46. Beginning in 2024, a flurry of reports and governmental investigations revealed the Defendants' Formulary Manipulation Scheme involving their affiliated GPO, Ascent.[1]

---

[1] On January 14, 2021, the United States Senate Committee on Finance released a report that revealed drug companies increased the list price of insulin, in part, to allow them to offer larger rebates to PBMs (including Express Scripts), in the hopes that their drugs would receive preferred PBM formulary placement. However, during the time that the Senate Finance Committee investigated PBMs, including Express Scripts, Ascent was in its infancy. As such, at the time the Senate Insulin Report was released, Plumbers' Welfare Fund, the Class, and the public had no knowledge of Defendants' Formulary Manipulation Scheme alleged herein, which uses Ascent as Defendants' conduit to misclassify rebates and administrative fees and manipulate formularies. *See* Staff of S. Comm. on Fin., 116th Cong., Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug (Comm. Print 2021),

47.     On March 27, 2024, the Office of Personnel Management Office of Inspector General issued a report ("OPM-OIG Report") which found that Express Scripts' agreements with drug companies "allow[ed] Ascent to keep [a] portion of rebates" from drug companies that should have been passed through to ESI PBM customers pursuant to the terms of those customers' contracts.[2]

48.     Then, on June 21, 2024, *The New York Times* published an article (the "June 2024 NYT Article") exposing PBMs for prioritizing their own interests, often at the expense of ESI PBM clients.[3] This article exposed that amid growing pressures on Defendants from ESI PBM clients to share with them more rebates and manufacturer discounts, Express Scripts altered its business model and created Ascent as a new vehicle to avoid its contractual obligations to share monies with ESI PBM clients.

49.     On July 9, 2024, the House Committee on Oversight and Accountability issued a report titled "The Role of Pharmacy Benefit Managers in Prescription Drug Markets" ("House Report").[4]

---

https://www.finance.senate.gov/imo/media/doc/Insulin%20Committee%20Print.pdf ("Senate Insulin Report").

[2] U.S. Off. of Pers. Mgmt. Off. of Inspector Gen., Rep. No. 2022-SAG-029, *Audit of the American Postal Workers Union Health Plan's Pharmacy Operations as Administered by Express Scripts, Inc. for Contract Years 2016 through 2021* (Mar. 27, 2024), https://oig.opm.gov/reports/audit/audit-american-postal-workers-union-health-plans-pharmacy-operations-administered-0 ("OPM-OIG Report")

[3] Rebecca Robbins & Reed Abelson, *The Opaque Industry Secretly Inflating Prices for Prescription Drugs,* N.Y. Times, (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html ("June 2024 NYT Article").

[4] Staff of H. Comm. on Oversight & Accountability, 118th Cong., Rep. on the Role of Pharmacy Benefit Managers in Prescription Drug Markets 6 (Comm. Print 2024), https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf (the "House Report").

50. Also on July 9, 2024, the U.S. Federal Trade Commission Office of Policy Planning issued an Interim Staff Report titled "Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies" ("FTC Report").[5]  On September 20, 2024, the FTC filed *In Re: Caremark Rx, Zinc, Express Scripts, Evernorth, Medco, Ascent, OptumRx, Optum Rx Holdings, Emisar*, Docket No. 9437 ("FTC Complaint").[6]

51. Further, Hunterbrook Media ("Hunterbrook"), an investigative and global reporting firm, has conducted an extensive investigation into Express Scripts and Ascent.  Plaintiff's counsel has collaborated with Hunterbrook in aspects of that investigation, and obtained proprietary investigative materials developed by Hunterbrook supporting the allegations herein.

**B.    Express Scripts' Role as a PBM**

52. Express Scripts manages prescription drug benefits for health insurance plans, employers, and government programs.  As a PBM, Express Scripts acts as an intermediary between ESI PBM customers, pharmacies, and drug companies.

53. Specifically, ESI PBM customers retain Express Scripts to maximize savings and constrain their drug expenditures by negotiating favorable rates and rebates with drug companies, and by constructing and managing a drug formulary that prioritizes both efficacy and cost effectiveness to limit expenses.

---

[5] FTC Off. of Pol'y Plan., Interim Staff Report, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs & Squeezing Main Street Pharmacies (2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf  ("FTC Report").

[6] Complaint, *In Re: Caremark Rx, LLC, Zinc Health Services, LLC, Express Scripts, Inc., Evernorth Health, Inc., Medco Health Services, Inc., Ascent Health Services LLC, OptumRx, Inc., OptumRx Holdings, LLC, & Emisar Pharma Services LLC*, FTC Docket No. 9437 (Sep. 20, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/d9437_caremark_rx_zinc_health_services_et_al_part_3_complaint_corrected_public.pdf ("FTC Complaint").

54.     The PBM industry is highly concentrated and the three largest PBMs (Express Scripts, CVS Caremark, and OptumRx) control approximately 80% of the market. Express Scripts is the largest PBM, administering pharmacy benefits for 85 million patients nationwide.

55.     Through numerous acquisitions, Defendants have created a massive, purpose-built healthcare conglomerate meant to enhance their own profits at the expense of Express Scripts' PBM clients. Now, Express Scripts has significant control over which drugs are available to the millions of patients covered by ESI PBM customers and the cost of those drugs.

56.     Specifically, Defendants Cigna, Evernorth, and Express Scripts are vertically integrated with Ascent, a purported GPO, which creates a consolidated vertical marketplace.

57.     This vertical integration is self-serving and provides Express Scripts with an immense amount of power in the market. It allows Express Scripts and its parent, Defendant Cigna, to funnel customers to different branches of their multi-faceted organization and leverage their control and negotiating power to implement and profit from the Formulary Manipulation Scheme.

58.     Negotiations between Express Scripts and drug companies concerning formulary access and placement occur behind closed doors despite Express Scripts' representations that it champions transparency for those who pay for its PBM services.

59.     Decades ago, PBMs were simply administrative service providers. The role of PBMs expanded when they began promising to deliver cost savings to PBM customers by negotiating with drug companies on behalf of PBM customers, developing formularies of approved drugs, and developing reimbursement terms and conditions for pharmacies.

60.     Express Scripts now performs a variety of functions for ESI PBM customers, including: (1) creating and maintaining formularies, which are lists of covered drugs; (2) using its

17

purchasing power to negotiate pricing and rebates with drug companies, supposedly for the benefit of ESI PBM customers; and (3) contracting with pharmacies, setting reimbursement terms for drugs dispensed to patients, and processing pharmacy claims for prescription drugs distributed by their vertically integrated specialty pharmacies.

61.     The design and management of drug formularies is one of the primary services that Express Scripts provides to Plumbers' Welfare Fund and the Class.  A formulary is a list of covered drugs for the beneficiaries covered by each ESI PBM customer.[7]  Drug formularies are critical tools that ESI PBM customers use to manage prescription drug benefits for their beneficiaries.  For ESI PBM customers like Plumbers' Welfare Fund, a drug formulary designates which prescription drugs are covered by the ESI PBM customers.

62.     Express Scripts has used its expanded position in the marketplace to design formularies for its own profit.

63.     *First*, Express Scripts designates which drugs are available for coverage.  PBMs' drug formularies typically place certain drugs on an "exclusion list."  Being on this list effectively excludes a drug from coverage. A drug formulary also can give certain medications "preferred" status vis-à-vis similar medications.

64.     *Second*, a drug formulary also may have various "utilization management" requirements to condition when ESI PBM customers have to pay for specific drugs, including step therapy and prior authorization requirements.  Where utilization management requirements are in force, ESI PBM customers only have to pay Express Scripts for coverage of a particular drug when a member has met certain criteria.

---

[7] Drug formularies also are referred to as "drug benefit policies" or "medical benefit policies."

65. *Third*, drug formularies typically have a "tier" structure, which categorizes drugs into various "tiers" that correspond with patients' cost-sharing obligations for the drugs, with drugs classified as Tier 1 typically having a lower out-of-pocket cost to patients classified as Tier 2, and so forth. Typically, each formulary has several tiers of non-specialty drugs and a designated tier of drugs that are designated as "specialty."

66. In short, Express Scripts' formulary design and management for ESI PBM customers can effectively determine whether various drugs will be covered by ESI PBM customers (and therefore be available to their beneficiaries), how much those beneficiaries pay Express Scripts for each drug, whether multiple competing drugs will be available to a patient with a given condition, and whether a patient will need to meet certain requirements, such as obtaining a specific authorization or trying other drugs, before obtaining coverage for a given drug.

67. For drug companies, the formulary of a major PBM like Express Scripts is the gateway to ESI PBM customers that provide and pay for health benefits for millions of patients. Those individuals that receive their prescription drug benefits through an ESI PBM customer generally cannot access a company's drug if it is not on Express Scripts' formulary, and may face hurdles to access a drug where utilization management measures are applied. Additionally, placing a drug on a more favorable formulary tier—at a lower out-of-pocket cost to patients—than a competing drug to treat the same condition may shift sales to the favored drug. Accordingly, drug companies are dependent upon Express Scripts' inclusion of the drug on its formularies, and placement on a favorable formulary tier vis a vis competing drugs, to access the broadest market for their drugs. For ESI PBM customers, the inclusion and favoring of high-cost drugs drives up the cost of the drug benefit they provide to their members and beneficiaries.

68. The direct and powerful impact that Express Scripts' formulary placement decisions can have on the utilization and sales of prescription drugs have long been recognized. As early as 2016, for example, *Barrons* explained that when "CVS Health . . . and Express Scripts . . . released their formulary exclusion list[s]," it made "some waves" in the healthcare industry. This is because the "coverage list determines whether millions of privately insured individuals can easily use an insurance co-payment to buy their prescription [drugs]." More specifically, when "a drug is excluded, it can dramatically hobble sales" of that drug.

69. The House Committee on Oversight and Accountability recognized that if a specific drug is "included on a formulary, especially in a lower tier, means that more people will have access to [that] drug at lower costs."

70. Further, as Express Scripts has long known, the impact of formulary placement on drug sales gives it enormous negotiating power with drug companies. In 2015, for example, a senior executive at Express Scripts unequivocally stated that formulary decisions "move market share" for drug companies. A 2018 article in *STAT*, an influential healthcare industry publication, described PBMs as "the [healthcare] industry's heavyweights" that wield "enormous power over the availability and pricing of essential medicines." Defendants used this knowledge to create and execute the Formulary Manipulation Scheme through the PBM Fraud Enterprises.

71. Moreover, a September 2023 analysis in *JAMA Health Forum*, a publication of the American Medical Association, found that Express Scripts and other major PBMs can "affect the financial interests of various stakeholders," including "drug manufacturers." Specifically, "PBMs have control over branded drugs' sales volume through formulary designs and utilization management."

20

72. In addition to designing and managing drug formularies, Express Scripts, as a PBM, also agrees via contract to negotiate drug prices with drug companies on behalf of ESI PBM customers. While negotiating, Express Scripts purports to achieve cost savings for ESI PBM customers by having manufacturers agree to refund of a portion of the purchase price paid for the drug.

73. These refunds, known as "rebates" (and sometimes "administrative fees"), are paid by the drug company to Express Scripts, which then shares the rebate payments with ESI PBM customers. Historically, PBMs kept the balance of the rebate for themselves but, over time, ESI PBM customers have successfully bargained with Express Scripts (and other PBMs) to remit the majority of such rebate payments to their PBM customers.

74. As both public reporting and government investigations have found, the three major PBMs, including Express Scripts, leverage the negotiating power arising from their control of drug formularies to obtain different forms of payments from drug companies.

75. Congressional investigations confirm the existence of "a clear financial incentive" on the part of drug companies "to secure access" to drug formularies, "especially in a lower tier." As the House Committee on Oversight and Accountability recently explained, paying for formulary access "is even more important" for "health conditions and diseases . . . that can be treated by several similar drugs."

76. Express Scripts' powerful leverage over drug companies should have enabled it to negotiate the maximum possible rebates for ESI PBM customers. Instead, Defendants used that leverage to enrich themselves by selling formulary access and favorable formulary placement to the highest bidder, with Ascent as a vehicle to receive kickbacks from manufacturers.

**C.    Express Scripts' Contracts with Plumbers' Welfare Fund and the Class**

77.    Plumbers' Welfare Fund contracts with Express Scripts for the purpose of Express Scripts providing PBM services to Plumbers' Welfare Fund in a manner that lowers Plumbers' Welfare Fund's prescription drug spend.  All other members of the Class contract with Express Scripts for the same purpose, and as noted by Cigna in its 2024 Form 10-K, "most" Express Scripts clients elect for the same rebate arrangement.

78.    This contract specifies that Express Scripts will pay Plumbers' Welfare Fund, for both non-specialty and specialty drugs, an amount equal to the greater of "100% of the Rebates and Manufacturer Administrative Fees" received by Express Scripts, or predetermined guaranteed amounts under the Express Scripts' Basic Formulary.

79.    Plumbers' Welfare Fund's contract with Express Scripts also defines "Manufacturer Administrative Fees" as "those administrative fees paid by pharmaceutical manufacturers to, or otherwise retained by, [Express Scripts] pursuant to a contract between [Express Scripts] and the manufacturer and directly in connection with [Express Scripts'] administering, invoicing, allocating and collecting the Rebates under the Rebate program."

80.    The Fifth Amendment of Plumbers' Welfare Funds' contract with Express Scripts, which provides the most recent update to the definition of the term, defines "Rebates" as:

> "Retrospective formulary rebates that are paid to [Express Scripts] pursuant to the terms of a formulary rebate contract negotiated independently by [Express Scripts] and directly attributable to the utilization of certain Covered Drugs by Members.
>
> For sake of clarity, Rebates do not include, for example, Manufacturer Administrative Fees; product discounts or fees related to the procurement of prescription drug inventories by [Express Scripts] Specialty Pharmacy or the Mail Service Pharmacy; fees received by [Express Scripts] from pharmaceutical manufacturers for care management or other services provided in connection with the dispensing of products; or other fee-for-service arrangements whereby pharmaceutical manufacturers generally report the fees paid to [Express Scripts] or its wholly-owned subsidiaries for services rendered as 'bona fide service fees' pursuant to federal laws and regulations (collectively, 'Other Pharma Revenue').

Such laws and regulations, as well as [Express Scripts'] contracts with pharmaceutical manufacturers, generally prohibit [Express Scripts] from sharing any such 'bona fide service fees' earned by [Express Scripts], whether wholly or in part, with any [Express Scripts] client."

81.     Express Scripts' contracts with Plumbers' Welfare Fund and the Class also provided that Express Scripts would ***not*** consider payments from drug companies to its corporate affiliates, including Ascent, in its drug formulary placement decisions.  Specifically, the contracts that Express Scripts maintains with Plumbers' Welfare Fund and the Class incorporate a standard financial disclosure, entitled "Financial Disclosure to ESI PBM Clients," concerning "the principal revenue sources of Express Scripts, Inc." and its corporate affiliates.  This disclosure has been incorporated into Plumbers' Welfare Fund's Pharmacy Benefit Management Agreement with Express Scripts since the Fifth Amendment executed in 2020.

82.     In this financial disclosure, Express Scripts acknowledges that it has been affiliated with several different "lines of business" since it "was acquired by Cigna Corporation" in December 2018, and that those include "group purchasing organizations" like Ascent.  The financial disclosure provides that "[c]ompensation derived through these [affiliated] business arrangements [like Ascent] is not considered for PBM formulary placement[.]"

83.     However, despite Express Scripts' assurances to its PBM clients that it does not consider compensation from drug companies in formulary placement, Express Scripts used Ascent to secretly receive compensation from drug companies, in the form of bribes and kickbacks, and such compensation directly impacted Express Scripts' formulary decisions.  As such, Express Scripts committed an express breach of its contracts with Plumbers' Welfare Fund and the Class.

**D.    Defendants Created Ascent, a Fake Foreign GPO, to Implement the Formulary Manipulation Scheme**

84.     Defendants created Ascent in April 2019 as a sister company to Express Scripts within Cigna's Evernorth division. Defendants organized Ascent in Switzerland, a country known

23

for its lack of financial transparency and low tax rates. According to industry experts cited by the House Report, Express Scripts likely chose to base Ascent in Switzerland to "[l]everage GPO safe harbor rules to avoid rebate reform and enable Express Scripts to collect GPO admin fees." In an interview with Hunterbrook, Former Cigna and Express Scripts Chief Medical Officer, Steve Miller, directly stated "[p]art of the thinking is you could eventually globalize it but also there are tax advantages. . . . We were in Schaffhausen."

85. Rather than having Express Scripts itself negotiate with drug companies on behalf of ESI PBM customers (as Express Scripts did until the creation of Ascent), Defendants created Ascent to negotiate with drug companies and receive fees that would not be shared with ESI PBM customers as rebates or administrative fees. That is, Ascent was created to perform the primary function (negotiating drug prices with drug companies) that ESI PBM customers retained Express Scripts to perform, and which Express Scripts itself had been performing prior to the creation of Ascent.

86. Defendants used Ascent for such negotiations because monies paid by drug companies to Ascent are not deemed "Rebates" or "Manufacturer Administrative Fees" under Express Scripts' contracts with Plumbers' Welfare Fund and the Class. Defendants thus use Ascent to extract payments from drug companies for themselves in exchange for formulary access and placement. In doing so, Defendants have disguised payments from drug companies that would be deemed "Rebates" and "Manufacturer Administrative Fees" if paid directly to Express Scripts. This allows Express Scripts to avoid paying ESI PBM customers the rebates contractually guaranteed to them, and instead, funnel monies that should be negotiated and categorized as rebates directly to Defendants.

87.    In other words, Ascent is a "GPO" in name only.  Traditionally, GPOs purchase drugs and other medical supplies on behalf of a group of health care providers like hospitals.  By aggregating a large group of purchasers, a typical GPO providing bona fide services to clients gains additional leverage to secure better pricing.  As the largest PBM, ESI manages prescription drug coverage for 85 million patients covered by ESI PBM customers across the United States.  Express Scripts therefore already had massive negotiating leverage and had no need to create a GPO to obtain the leverage it already possessed.

88.    Moreover, Ascent's role of negotiating contracts, including rebates, with drug companies, simply replicates a task Express Scripts previously conducted itself on behalf of its clients.  As described by a former Senior Director at Prime Therapeutics, which is a minority owner of Ascent, "I haven't heard anybody who was happy about [the rise of PBM owned GPOs] because I haven't heard that they're getting any services that are different than what they had before.  What are you paying more for?  What's the value?"

89.    Indeed, negotiating drug prices on behalf of its ESI PBM customers and their members is ostensibly a primary purpose of the Express Scripts PBM.  There was no legitimate purpose for Defendants to form a separate GPO, base it in Switzerland, and assign to it the critical responsibility of negotiating drug prices and rebates previously handled by Express Scripts itself.

90.    While Defendants have falsely claimed that Ascent is paid for providing GPO services or "rebate administration services" neither is the true reason for the billions of dollars that drug companies have paid Ascent.  Instead, these payments from drug companies to Ascent are payments for formulary access and preferential formulary placement that Express Scripts has exacted from drug companies by leveraging its representation of ESI PBM customers for its own benefit, and that of its corporate affiliates.

91. *First*, as the FTC found, Ascent is a very different from the "traditional GPOs that purchase drugs and other medical supplies on behalf of the health care providers like hospitals." Instead, the FTC found that Ascent merely took over some of the tasks that Express Scripts, as a PBM, had "historically engaged in directly."

92. Further, as the FTC noted, Cigna itself "initially did not consider [Ascent] to be [a] GPO[.]" This is corroborated by health industry expert Adam Fein, who reported that "Express Scripts' PR team told me [in or around 2021] in no uncertain terms: 'Ascent is not a GPO.'"

93. While a GPO exists to aggregate the purchasing power of a "group" in order to reduce prices by either purchasing in higher volumes or gaining leverage to negotiate lower prices, Express Scripts had massive leverage prior to the creation of Ascent, and did not need to add the additional lives covered by Prime Therapeutics and Kroger in order to negotiate for lower prices.

94. A former Senior Vice President at OptumRx, another leading PBM that created its own purported GPO like Ascent, explained that PBMs like Express Scripts and OptumRx do not need a GPO to provide the volume needed to negotiate better prices from manufacturers: "Historically, a group purchasing organization has been a banded group of like organizations that combine their purchasing agreements in order to get a better deal because of higher volume. That's the traditional GPO." In contrast, the new "GPOs" created by major PBMs "are much more sophisticated than that. If you look at them, whether it's Ascent, Emisar, Zinc, it's not necessarily building a volume. These three PBMs already have high volume. CVS has a high volume. Optum has a high volume. ESI has a high volume. . . . What they're doing to make money is really providing contracting and aggregation services for PBMs so they can get more money from drug manufacturers." These new PBM-created GPOs "can get new revenue sources from manufacturers that aren't called rebates, such as administration fees, data services fees, portal fees, compliance

fees . . . They're really generating revenue in fees that aren't fully shared with PBM clients and maybe provide PBMs with a hedge against potential reform of pricing practices."

95.     *Second*, while Ascent purports to offer various administrative or data services, a simple comparison of Ascent's size and the enormous amount that it has been paid from drug companies shows that Ascent is selling access to Express Scripts customers and not being paid for providing *bona fide* services.

96.     Specifically, Ascent employs fewer than 100 people and is based in a small building an hour from Zurich that is shared with several other businesses identified by a local newspaper as "letterbox companies" set up for tax advantages. During a business day visit, only a half-dozen people were working in the Ascent office. The billions of dollars that drug companies pay Ascent, purportedly for administrative services and fees, amounts to revenue per employee in excess of $84 million. For context, Apple, Inc.'s revenue per employee is estimated to be about $2.38 million.

97.     The truth is that Ascent is not really a GPO, and the billions it receives from drug companies are kickbacks tied to the Formulary Manipulation Scheme rather than legitimate fees. As reported by the *New York Times*, "[t]he largest PBMs recently established subsidiaries that harvest billions of dollars in fees from drug companies, money that flows straight to their bottom line and does nothing to reduce health care costs."

98.     Most recently, on February 4, 2026, the FTC secured a settlement with Express Scripts in its lawsuit alleging that Express Scripts' conduct resulted in artificially inflated insulin drug prices (the "FTC Order").[8]  In tacit acknowledgment of Express Scripts' GPO related

---

[8] Proposed Decision and Order as to ESI Respondents, *In Re: Caremark Rx, LLC, Zinc Health Services, LLC, Express Scripts, Inc., Evernorth Health, Inc., Medco Health Services, Inc., Ascent Health Services LLC, OptumRx, Inc., OptumRx Holdings, LLC, & Emisar Pharma Services LLC*,

misconduct, Section X(A) of the FTC Order requires that Express Scripts move all "activities, employees, functions, and assets used by [] Ascent for the purpose of rebate negotiating and contracting" from Switzerland to the United States.  In addition, Section X(B) of the FTC Order mandates that Ascent can no longer leverage GPO safe harbor rules to avoid rebate reform because it requires that "[a]ny Rebate GPO owned or controlled by Respondent will comply with the GPO Safe Harbor reporting and disclosure obligations as set forth in 42 C.F.R. § 1001.952."

### E. During the Class Period, Defendants' Formulary Manipulation Scheme Extracted Billions of Dollars in Bribes and Kickbacks to Ascent

99.     Given the disparity in knowledge and expertise between Express Scripts and its PBM customers, and the enhanced cost of creating a customized formulary, Express Scripts' PBM customers do not have the ability to effectively craft or modify formularies on their own.  Even when an ESI PBM customer opts for a customized formulary, Express Scripts has enormous influence and control over the process of creating and revising the formulary.

100.    Express Scripts represents in its contract with ESI PBM customers that compensation derived from its business agreements "is not considered for PBM formulary placement[.]"  In reality, Express Scripts considers its own potential profit, including payments drug companies make to Ascent, when structuring formularies, rather than just making formulary decisions based on therapeutic benefit or affordability.  This is in stark contrast to Express Scripts' representation that "[f]inancial impact to Express Scripts" is not considered in formulary placement, as then-President of Express Scripts Adam Kautzner testified to Congress.

---

FTC             Docket          No.             9437            (Feb.           4,              2026), https://www.ftc.gov/system/files/ftc_gov/pdf/d09437caremarkproporder-esiresps.pdf          ("FTC Order").

101. As an audit by OPM-OIG uncovered, Cigna, Express Scripts, and Ascent orchestrated an arrangement with drug companies that "allow[ed] Ascent to keep [a] portion of the rebates" from drug companies that should have been shared with Express Scripts' PBM customers. In other words, Ascent's function within the Cigna PBM Fraud Enterprises was to receive the bribes and kickbacks paid by drug companies that, if paid directly to Express Scripts, the Defendants would have to share with ESI PBM customers.

102. By channeling bribes and kickbacks from drug companies through Ascent, Defendants have limited the transparency that Express Scripts provides to Plumbers' Welfare Fund and the Class regarding these payment arrangements. For example, Express Scripts does not disclose to its PBM customers the payment terms between Ascent and drug companies relating to Ascent's supposed rebate administration services on Express Scripts' behalf. Defendants also do not allow Plumbers' Welfare Fund and the Class to examine the payments from drug companies to Ascent pursuant to ESI PBM customers' contractual audit rights.

103. Freed from scrutiny by PBM customers, Defendants have conspired with drug companies to divert hundreds of millions of dollars that would otherwise have been paid to Express Scripts as "Rebates" and "Manufacturer Administrative Fees"—and passed through to ESI PBM customers pursuant to Express Scripts' contracts with those customers—to Ascent so that Express Scripts would not have to share those payments with Plumbers' Welfare Fund and the Class.

104. A report by the Community Oncology Alliance explains, "PBMs have increasingly 'delegated' the collection of manufacturer rebates to 'rebate aggregators [GPOs], which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and

29

[GPOs], as well as contracts between PBMs, [GPOs,] and pharmaceutical manufacturers) are not readily available to plan sponsors." Indeed, the Community Oncology Alliance found that "PBMs employ exceedingly vague and ambiguous contractual terms to recast monies received from manufacturers outside the traditional definition of rebates, which in most cases must be shared with plan sponsors. Rebate administration fees, bona fide service fees, and specialty pharmacy discounts/fees are all forms of money received by PBMs and [GPOs] which may not be shared with (or even disclosed to) the plan sponsor. These charges serve to increase the overall costs of drugs, while providing no benefit whatsoever to plan sponsors."

105. The 2024 OPM-OIG Report reveals the sheer magnitude of the rebate payments from drug companies that Defendants have been diverting through Ascent into their own pockets. For just one federal employee health plan, the American Postal Workers Union ("APWU"), the OPM-OIG found that "Ascent [had] withheld $14,452,616 in rebates" over a 19-month period (June 1, 2019, through December 31, 2020). According to Express Scripts' website, it is "largest manager of pharmacy benefits in the United States." Defendants, therefore, have diverted billions of dollars in drug company payments from Express Scripts' PBM customers, like Plumbers' Welfare Fund, to Ascent each year.

106. The immense impact of Defendants' improper diversion and retention of payments from drug companies through Ascent is also made clear by comparing the total amount of rebates that Express Scripts shared with APWU in 2019 and 2020 and the amount of the rebates that Defendants improperly withheld using Ascent.

107. Specifically, according to the OPM-OIG Report, APWU received $68.3 million in rebate credits from Express Scripts in 2019 and $61.8 million in 2020. The $14.4 million of rebates that Defendants improperly withheld from APWU using Ascent over 19-month period, therefore,

*were more than 10%* of the rebates that APWU received from Express Scripts in 2019 and 2020. This increases to *14.2%* if one uses the same 19-month period (June 1, 2019, through December 31, 2020), if the rebates credited to APWU were the same from month to month in 2019.

108.    While Express Scripts refunded APWU once the OPM-OIG uncovered its rebate retention fraud, Defendants have continued to perpetrate that same fraudulent scheme through Ascent to improperly divert funds from Plumbers' Welfare Fund and the Class.

109.    A recent investigation by the FTC reached similar conclusions about Cigna's improper diversion of rebate payments using Ascent. After analyzing documents and data produced by Express Scripts and Ascent, the FTC Report stated that Cigna and its peer PBMs formed "rebate aggregators" like Ascent for purposes of "retain[ing] revenue from incremental fee structures."

110.    Specifically, the FTC highlighted the fact that "rebate aggregators" like Ascent have introduced "novel fees" such as "data/portal fees" and "vendor fees" to collect money from drug companies. As a result, the FTC noted that healthcare analysts have estimated that Express Scripts and its peer PBMs "have extracted from drug companies billions of dollars in additional fees, which nearly doubled from approximately $3.8 billion in 2018 to $7.6 billion in 2022."



111. Such fees barely existed before Express Scripts created Ascent. For example, data and data portal fees obtained by PBMs and PBM contracting entities in the U.S. increased from just 0.03% of commercial sales in 2019, the year Ascent was created, to 0.56% in 2022. From 2018, before the creation of Ascent, to 2022, the combination of administrative fees, contracting entity vendor fees, data/portal fees and supplemental or uncategorized fees increased from 3.43% of U.S. commercial brand sales in 2018 to 4.39%, despite the decline in manufacturer administrative fees over this same period. Conveniently for Express Scripts, manufacturer administrative fees are the only fees set to pass through to ESI PBM customers.

112. Recent interviews with former Cigna and drug company executives lay bare the predatory nature of the fees that Defendants have made drug companies pay to Ascent.

113. A former executive at a major drug company, for example, explained to *The New York Times* that his responsibilities at the drug company included negotiating with entities like Ascent. According to this former drug company executive, he had a set pool of money to cover both rebates and fees for entities like Ascent, and when he was asked to pay more in fees, he offered

less in rebates. As this former drug company executive recognized, ESI PBM customers were entirely unaware of this trade-off because the plans could not see the billions of dollars in fees that were paid to and retained by entities like Ascent.

114. Steve Miller, the former CMO of Cigna and Express Scripts and a co-founder of Ascent, also acknowledged in an interview with Hunterbrook that "there are lots of different fees you can charge" through Ascent—"You can charge data fees. You can charge administrative. You can charge clinical fees. The fees fall into different buckets." Establishing Ascent, according to Mr. Miller, has allowed Cigna and Express Scripts to "double, triple dip on fees."

115. As explained by a former Senior Vice President at a UnitedHealth Group, which owns its own leading PBM, when PBM customers' demand for a greater share of rebates forced PBMs like Express Scripts to question "How do I preserve my profitability," the response was "moving from what we're calling rebates to administrative fees, these new revenue sources. You can call them admin fees, data services fees, compliance fees, etc., in order to extract either the same money from drug companies or additional money from drug companies." The former Senior Vice President expanded on those "new revenue sources" to say "you can call them whatever you want. You can call them compliance fees, you can call them adherence fees, you can call them data fees, whatever. I like humor as well. It's essentially: how do we shake down pharma for more money?"

116. According to that same former UnitedHealth Group Senior Vice President, the fees extracted from drug companies by GPOs like Ascent directly impact the price of drugs:

> GPOs are just another middleman. They're just another middleman. They're taking a piece out. Pharma manufacturers just build this into their pricing. . . . When they're doing their pricing modeling, part of the pricing modeling is what is the value of this drug, but they also look at, 'Hey, I've got to pay up 300 basis points to the GPO. I'm going to have to pay another 2% in, let's call it, administrative fees or compliance fees or whatever it is. I got a 5% here. When it gets down to the PBM, I'm paying another 3% or 5% to them. Hey, they're going to nick me on [formulary] tier structure, so I may have to pay another 5%.

117. The impact of Defendants' extraction of ever-increasing fees from drug companies was corroborated by a former Director at Express Scripts, who explained that "the only reason as a manufacturer, I'm raising prices [is] because the PBM wants more, and the PBM just says the manufacturer is trying to be greedy, and there's a lot of finger-pointing."

118. Indeed, the value of drug company payments to the PBMs was highlighted during the 2023 Senate Hearing. Executives from Sanofi, Eli Lilly, and Novo Nordisk testified that $0.75 to $0.84 of every dollar spent on the list price of many of their drugs goes directly to PBMs or their affiliated GPOs.

119. At that hearing, the CEO of Eli Lilly, David Ricks, stated that securing positions on PBM formularies "requires [drug] manufacturers to pay ever-increasing rebates and fees" and Eli Lilly paid "$1 billion in fees" in a single year "to ensure our medicines were covered."

120. The FTC Order touches on much of this misconduct, as it requires Express Scripts to provide increased transparency to ESI PBM customers. For instance, it mandates that Express Scripts provide drug-level reporting and data to permit compliance with United States Transparency in Coverage regulations, and also requires that Express Scripts disclose payments to any consultants or brokers representing ESI PBM customers.

121. Additionally, the FTC Order requires Express Scripts to provide more standard offerings to its PBM customers, which aims to reduce Express Scripts' ability to increase its customers' drug spend via hidden payments and fees. According to Section VI of the FTC Order, Express Scripts will provide a standard offering to its PBM customers that ensures that members' out-of-pocket expenses will be based on the drug's net cost, rather than its artificially inflated list price. Further, Section V of the FTC Order requires that Express Scripts "enable [ESI PBM customers] to receive the benefit of any Rebate or discounts applicable to any Drug Product

directly at the point of sale, and will not charge a fee for providing or administering such point-of-sale rebate program, other than its actual cost to pre-fund any rebate" and that Express Scripts "will not provide a guarantee to [ESI PBM customers] of a pre-determined amount of compensation, including Rebates, from Drug Manufacturers."

**F.     Express Scripts Manipulated Formularies In Exchange For The Kickbacks Drug Companies Paid To Ascent**

122.    While drug companies do not care about how their pool of funds is divided between GPO fees and rebates to PBM customers, drug companies do care about keeping their brand-name, high-priced drugs on Express Scripts' formularies over cheaper biosimilar or generic versions of those drugs. This preferable formulary placement is what Defendants offered in return for the billions of dollars paid to Ascent.

123.    In the June 2024 NYT Article, a former executive of a major drug company, whose responsibilities included negotiating with GPOs, explained that he had a set pool of money to cover fees paid to GPOs and rebates to the PBM's customers employers. When he paid a GPO more in fees, he offered less in the rebates that went to the PBMs' customers, who were entirely unaware of the billions of dollars in fees that the GPOs reaped for themselves.

124.    Internal documents make clear that the pay-to-play nature of the Express Scripts' formulary placement decisions has not been isolated to a few specific drugs; instead, it was a systemic and regular practice. For example, as brand-name, high-priced drugs neared the end of their patent exclusivity periods, Express Scripts employees actively discussed how they could shift patients to other high-cost drugs, which would enable Defendants to maintain the flow of payments from drug companies to Ascent:

*Figure 11: Express Scripts internal document indicating how they would
shift claims to move lucrative medications[189]*

**Psoriasis**
- Humira
  - Move ■% of Psoriasis claims (■% of all Humira claims)
  - Shift claims to
    - Enbrel ■% - also a TNF
    - Cimzia ■% - also a TNF (unexcluding)
    - Otezla ■% - IL 12/23 less immunogenic
    - Tremfya ■% - IL 23 less immunogenic
    - Taltz ■% - IL 17 less immunogenic
- Skyrizi
  - Move ■% (Psoriasis is only indication)
  - Shift claims to
    - Tremfya ■% - also IL 23
    - Stelara SC ■% - IL 12/23
    - Enbrel ■%
    - Cimzia ■%
    - Otezla ■%

**Rheumatoid Arthritis-Like**
- Humira
  - Move ■% of RA claims (■% of all Humira claims)
  - Shift claims to
    - Enbrel ■% - also TNF
    - Cimzia ■% - TNF with less market share
    - Xeljanz ■% - JAK, oral
    - Taltz ■% - IL 17
    - Actemra ■% - IL 6 but low market share
- Rinvoq
  - Move ■% (RA-like are only indications)
  - Shift claims to
    - Xeljanz ■% - also a JAK and oral
    - Enbrel ■% - market share leader
    - Cimzia ■%
    - Actemra ■% - low market share

**Ulcerative Colitis**
- Move ■% of UC claims (■% of all Humira claims)
- Shift claims to
  - Stelara SC ■%
  - Xeljanz ■% - JAK lower in guidelines
  - Simponi 100mg ■% - very low market share

125. The "Figure 11" shown above is based on an internal Express Scripts document showing that when a patent for a drug expires, Express Scripts unilaterally decides to shift claims for that drug to other high-cost drugs, prioritizing its own revenue streams without regard to drug affordability. Express Scripts actively considers whether a drug has patent exclusivity and how much market share a certain drug has before placing a drug on its formulary. Actions like this

36

illustrate how Express Scripts prioritizes more expensive patent-exclusive drugs, rather than generic drugs, effectively narrowing the number of drugs available to ESI PBM customers.

126.   The June 2024 NYT Article found "[e]ven when an inexpensive generic version of a drug is available, PBMs sometimes have a financial reason to push patients to take a brand-name product that will cost them much more."

127.   In addition, the FTC reviewed a number of contracts and internal documents summarizing manufacturer contracts, which revealed that some PBM contracts with manufacturers explicitly premise high rebates on the exclusion of AB-rated generics.[9]

128.   Analysis cited by the Association for Accessible Medicines ("AAM") in a comment letter to the FTC highlights how PBMs use their control of formularies to advantage costlier brand drugs over generic and biosimilar alternatives.   The AAM urged the FTC to examine PBMs' practice of "placing generic drugs on non-generic formulary tiers and preferring high-cost drugs over lower priced alternatives," citing "a consistent trend whereby PBMs placed more generics on non-generic tiers with higher cost-sharing," based on research by independent health care consulting firm Avalere Health.   This "allows PBMs to generate additional revenue."

129.   The AAM comment letter states that "PBMs Block Access to New Generic Drugs and Biosimilars to Increase Revenues," explaining that "[d]espite the ability of generics and biosimilars to drive reductions in costs, preferential tier placement for brand drugs still limits the availability of low-cost prescription drug options." The letter continues:

> FDA-approved generics and biosimilars may not be placed on a formulary at all, making them completely unavailable to patients even though these medicines are available and less expensive than their brand-name drugs counterparts . . . PBMs may dictate plans' decisions on which medications are covered on their national formulary, including the ability to recommend which products are excluded. In

---

[9] The FDA designates a pharmaceutical product as "AB" if there is adequate scientific evidence that is an adequate bioequivalent to a selected reference product.

2021, 1,343 drugs were excluded by formularies as required by the three largest PBMs. Often, the excluded products are biosimilars with lower prices. Formulary exclusions often work against the financial interests of patients, for example when the excluded medications have a lower list price than those that remain on formulary.

130.    These and other examples led the House Committee on Oversight and Accountability to conclude in the House Report that Express Scripts is incentivized to include higher priced drugs over lower priced generic drugs on its formularies in order to enhance its own profits. The House Report cites evidence that, when designing formularies, Express Scripts often made decisions based on the profitability to Defendants, rather than the benefit to patients or affordability to Express Scripts' PBM customers.

131.    Additionally, the House Report documented the impact of formulary placement on PBM customers' costs, identifying 300 instances in which Express Scripts and the two other leading PBMs preferred medications that cost at least $500 more per claim than comparable medications excluded from their formularies.

132.    A study conducted by the Drug Channels Institute shows the drastic increase in the number of products excluded from PBM formularies from 2012 to 2025:



Number of Products on PBM Formulary Exclusion Lists, by PBM, 2012 to 2025

Source: Drug Channels Institute analysis of company reports; Xcenda. Multiple formulations of a drug were counted as a single exclusion. Note that some data have been restated due to midyear additions to exclusion lists. Express Scripts did not publish exclusion lists before 2014. Optum Rx did not publish exclusion lists before 2016. Note that PBMs may exclude many of the same medications, so certain products may appear on multiple lists.

Published on *Drug Channels* ([www.DrugChannels.net](www.DrugChannels.net)) on January 22, 2025.



DRUG CHANNELS INSTITUTE
An HMP Global Company

133.    Defendants' handling of formulary placement for Humira, AbbVie's rheumatoid arthritis drug, when biosimilars of Humira began entering the market in 2023, illustrates this aspect of the pay-for-play arrangement.

134.    Tellingly, Defendants only began giving a biosimilar a more favorable formulary placement to Humira *after this became more profitable to Cigna*.  Specifically, as Defendants were preparing to launch Quallent, yet another subsidiary of Cigna, which sources medications from other companies and distributes them under its own label, they announced a biosimilar of Humira from Quallent.  Thus, Defendants only agreed to source a biosimilar of Humira once a separate Cigna subsidiary could source the medication and profit directly from the sales of this drug and its inclusion on the Express Scripts formularies.

135.    Further, Express Scripts excluded AstraZeneca's Calquence (a drug used to treat Chronic Lymphocytic Leukemia) in favor of the higher-priced Imbruvica.  In doing so, it ignored research showing that significantly fewer people who took Calquence experienced atrial fibrillation than those who took Imbruvica.

136.    Similarly, a 2023 Senate hearing revealed that when drug company Viatris released an interchangeable biosimilar, Semglee, at a 65% lower list price to the expensive brand name biologic drug equivalent, Lantus, PBMs, including Express Scripts, excluded Semglee from their formularies.  When Viatris subsequently rereleased the exact same product at a higher price (only 5% lower than Lantus), the major PBMs then added Semglee onto many of their formularies.

137.    Express Scripts' use of outright formulary exclusion has accelerated rapidly.  From 2014 to 2020, Express Scripts excluded 464 unique drugs for at least one year.  A 2020 study by Xcenda, a consulting firm specializing in pharmaceutical commercialization and consulting, found

that the number of medicines excluded from Express Scripts' standard formulary increased from 57 in 2014 to 380 in 2020, with an annualized increase of 37% and a total increase of 567%. In 2021, Express Scripts excluded approximately 400 drugs from its formularies. More broadly, the number of medicines excluded from the formularies of the three largest PBMs (including Express Scripts) increased 961% from 2014 (109 unique drugs exclusions) to 2024 (1,156 unique drug exclusions). This evidences Defendants' abuse of Express Scripts' role as gatekeeper by increasingly favoring high-cost brand drugs over lower-cost (yet safe and effective) drugs from its formularies in exchange for bribes and kickbacks to Ascent that fuel Defendants' profits.

138. Further, in tacit acknowledgment of these practices, in its recent settlement with the FTC, Express Scripts agreed to stop preferring high wholesale acquisition cost versions of a drug over identical low wholesale acquisition cost versions on its standard formularies.

## V.   DEFENDANTS FALSELY PORTRAY THEMSELVES LOWERING DRUG COSTS FOR ESI'S PBM CLIENTS

139. For decades, Defendants marketed Express Scripts' PBM business by claiming to help "our clients to rein in high drug costs." Express Scripts also has routinely asserted in public statements that its drug formulary design and drug rebate negotiations aim to lower the prescription drug expenditures of its PBM customers, and that it is dedicated to being transparent with ESI PBM customers regarding payments and costs. Throughout the Class Period, and especially after the publication of the June 2024 NYT Article, the House Report, and the FTC Report, Defendants received public scrutiny for their role in increasing drug prices. Yet, both before and after the 2024 public scrutiny, Defendants continuously describe, via interstate wires, their incentives as being aligned with ESI PBM customers—*i.e.*, that Defendants will share the benefits of reduced drug prices and increased manufacturer rebates with ESI PBM customers.

### A. Misrepresentations By Express Scripts' Executives and Spokespersons

140. As early as December 2011, well before the start of the Class Period, Express Scripts' then-Chairman and CEO, George Paz, told a Senate subcommittee that Express Scripts had "tremendous success in driving down prescription drug costs for . . . payors" and that this success was due to its drug formulary design decisions like giving favorable placements "to less costly, medically appropriate generic drugs" and having "step therapy programs." Mr. Paz also claimed that Express Scripts generated additional savings for its clients by "negotiating with drug makers" to obtain substantial discounts and rebates.

141. Similarly, in a hearing before the House of Representatives Subcommittee on Regulatory Reform, Commercial & Antitrust Law in November 2015, Express Scripts then-Vice President, Amy Bricker, claimed that the "number one goal [for Express Scripts] is to make prescription drugs safer and more affordable for our patients and clients" and that "[e]verything we do as a company is aimed at that goal." Moreover, Ms. Bricker testified that Express Scripts "lower[s] costs for our clients" by "forcing drug makers to compete against one another for placement on plan [drug] formularies."

142. According to Ms. Bricker, Express Scripts also leveraged its scale "to drive a hard bargain" to obtain higher discounts and rebates and, thus, "lower costs for patients, clients, and taxpayers."

143. Executives and spokespersons at Express Scripts have made the same claims about Express Scripts' purported dedication to reducing prescription drug spending in press releases, interviews and statements to investors. For example, in a February 15, 2017, call with analysts, then-Express Scripts CEO Tim Wentworth claimed that while "Drugmakers set prices," Express Scripts "exist[s] to bring those prices down" for its customers.

41

144.     Express Scripts made similar statements immediately before and throughout the Class Period. For example, on April 9, 2019, Express Scripts posted on its Twitter account that "#PBMs Express Scripts negotiates with drug company to increase competition and lower costs for patients" and "FACT: Public disclosure of negotiated rebates will not lower prescription drug costs."

145.     Additionally, in April 2019, when Ms. Bricker appeared at another congressional hearing before the House Subcommittee on Oversight and Investigations, she testified that Express Scripts would maintain its focus on "driving lower drug spending" after its acquisition by Cigna in December 2018. Ms. Bricker also reiterated her earlier claims that "our national formularies drive clinical efficiency at lower costs" and that Express Scripts was dedicated to using its "scale to negotiate lower drug costs with drug manufacturers."

146.     Ms. Bricker further asserted in her April 2019 congressional testimony that "***PBMs are built to lower prescription drug costs*** . . . [i]n fact, PBMs will help deliver $1 trillion in savings on drug costs to patients and health plans over the next 10 years."

147.     Also in April 2019, the former Chief Medical Officer for Defendants Cigna and Express Scripts, Steve Miller told a Senate committee that "***we are really a strong proponent for transparency for those who pay for health care***. So the patient should know exactly what they are going to pay. Our plan sponsors need to know exactly what is in their contract."

148.     In 2021, an Express Scripts spokesperson issued a statement to the *Managed Healthcare Executive* publication claiming that "[c]linical appropriateness of the drug–not cost–is our foremost consideration."

42

149. On April 13, 2023, in a press release titled "Express Scripts Further Advances Transparency and Affordability for Consumers and Clients," Adam Kautzner, then-President of Express Scripts, stated:

- "Reducing out-of-pocket costs for consumers is the single best thing we can do to improve the health of those we serve."

- "Additionally, Express Scripts is working with employer and health plan clients to offer consultative options to bring better affordability and predictability. This includes: adopting the broadest lists of preventive prescription drugs that are either fully covered or covered at a discount, lower premiums and deductibles, and increased Health Savings Account contributions for lower-income consumers based on IRS income requirements."

- "Our mission is simple: lower the cost of prescription drugs for the one in three Americans we serve. Today's actions demonstrate our ongoing commitment to that mission, and helps clients and consumers see the value of their pharmacy benefits at work more quickly in their daily lives."

150. In May 2023, Kautzner told a Senate committee that Express Scripts' role in the healthcare system is "negotiating with large pharmaceutical manufacturers to lower the cost of drugs for employers, health plans, federal and state government, and most importantly, patients."

151. Mr. Kautzner also claimed that Express Scripts "saves approximately $32 billion for those we serve, driven by effective negotiation" and "medical management" and that the "*savings negotiated by pharmacy benefit managers [like Express Scripts] are passed on to employers and health plans*[.]"

152. Further, regarding drug formulary design, Mr. Kautzner stated in his 2023 congressional testimony that "*[f]inancial impact to Express Scripts is . . . prohibited from consideration in the formulary development process*" and that Express Scripts only took clinical effectiveness and cost reduction into account.

153. Defendants' misuse of Express Scripts' formularies to sell drug companies access to ESI PBM customers and their beneficiaries is contrary to Express Scripts' representations that

it makes formulary decisions based on efficacy and value. Express Scripts claims that it makes formulary decisions through three Committees: the Therapeutic Assessment Committee, the National P&T Committee, and the Value Assessment Committee. First, according to Express Scripts, the Therapeutic Assessment Committee, consisting of "clinical pharmacists and physicians who are employed by Express Scripts," reviews scientific information to make a formulary placement recommendation to the P&T Committee. Then, according to Express Scripts, the P&T Committee, which consists of "practicing physicians and pharmacists not employed by Express Scripts," reviews formulary placement for all new and old medications. Finally, according to Express Scripts, these recommendations go to the Value Assessment Committee, comprised of "Express Scripts' employees from formulary management, product management, finance, and clinical account management." This Committee supposedly considers the "value of drugs by evaluating the net cost, market share, and drug utilization trends of clinically similar medications," and has the authority to designate a medication as included or excluded from all formularies, based on the economics of the medication.

154. Further, as recently as February 27, 2025, Cigna touted in its 2024 Form 10-K that "In 2024, for clients covered under our pharmacy benefit contracts, Express Scripts shared over 95% of the drug formulary management rebates it received with its integrated clients, and more than two-thirds of clients received 100% of rebates."

155. This statement is misleading because, through the Formulary Manipulation Scheme, Cigna and its co-defendants diverted funds to Ascent that should have been classified as rebates, mischaracterized those funds as fees, and thereby shared with its clients far less of the rebates it received than represented in the 2024 Form 10-K.

**B.**     **Misrepresentations On Express Scripts' Website**

156.     Express Scripts consistently used its website to tout its purported commitment to reducing its customers' drug expenditures. Since 2015, for example, that website has stated that Express Scripts is "dedicated to keeping our promises to patients and clients [,]" and that "all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."

157.     In August 2019, Express Scripts published an article on its website called "What's a Pharmacy Benefits Manager." In this article, Express Scripts asserted that:

- "PBMs add value . . . by reviewing the thousands of drugs [that] have been approved for use. An independent panel of physicians and pharmacists takes a close look at the drug and provides a formulary - a list of medications proven to provide the best clinical results for all conditions;" and

- "[b]y delivering smarter solutions to patients and clients, PBMs provide better care and lower costs with every prescription, every time."

158.     From at least as early as June 11, 2020, Express Scripts' website has stated:

- "Lowering costs while providing high-quality care shouldn't require compromises. We have programs and tools to help you successfully manage costs while helping your members improve their health and well-being."

- "In 2018, our industry-leading National Preferred Formulary provided payers and their members access to 3,886 medications, while saving $3.2 billion by directing members to lower-cost medications."

- "The coming boom in specialty generics presents a sizable opportunity for client savings. We can help with strategies to shift market share to these lower-cost alternatives while ensuring patient adherence."

- "As drug pricing strategies continue to evolve, we find new ways to help our clients control their costs. Our National Preferred Flex Formulary creates a pathway to cover lower list-price products, helps deliver lower member out-of-pocket costs, and reduces reliance on brand rebates. Like the National Preferred Formulary, the Flex formulary follows our clinical-first decision process for all new therapies."

- "Collectively bargained plans are challenged to preserve the benefit and meet member needs. We work with you to lower costs and ensure affordable access to high-quality care, without burdening your members. Partnering to help control

45

costs, drive out waste and deliver optimum care is what we do best."

- "Labor Unions: Our experienced, expert teams partner with you to help control costs and drive out waste, while delivering the best possible care to your members."

159. From at least as early as September 21, 2021, Express Scripts' website has stated:

- "By delivering smarter solutions to clients and their members, our PBM provides better care at lower cost."

160. From at least as early as April 11, 2022, Express Scripts' website has stated:

- "Labor unions face unique challenges overseeing their pharmacy benefit and supporting working families. That's why we help you maintain a rich member benefit, providing a consultative, flexible approach for managing budgets and controlling costs."

- "More than 250 labor funds trust us to care for 3.7 million members. And our 50 years of experience proves we're experts at meeting their needs. Driven and proactive, our dedicated teams leverage data analytics and insights to anticipate and address tough challenges while reducing plan and member costs."

## C.     Misrepresentations On Evernorth's Website

161. Evernorth, Cigna's subsidiary that oversees Express Scripts, made numerous statements assuring ESI PBM customers and the public that Express Scripts worked to save its customers money, thereby concealing the Formulary Manipulation Scheme and the PBM Fraud Enterprises that acted to further that scheme.

162. For example, a page on Evernorth's website entitled "The Reality of Rebates," which was published at least as early as April 15, 2024, and remains available as of the filing of this Complaint, states[10]:

- "Rebates are just one tool to lower drug costs—in direct response to skyrocketing prices set by big pharmaceutical companies."

- "Express Scripts exists to lower the cost of medications. *Express Scripts negotiates with drug companies to lower the cost of medications included on our clients' formularies.* As part of the negotiation process, pharmaceutical companies offer

_____

[10] April 15, 2024 is an estimation based on information publicly available. Discovery is needed to show the exact date and time that these statements were first made public on Evernorth's website.

rebates for some brand-name medications. When a consumer fills a prescription for a medication that offers a rebate, the drug manufacturer pays the rebate, which is shared with our clients based on the terms of our contracts. Clients decide how they want to use the savings and may elect for a very small percentage of rebates to be retained by the PBM."

- "Drug makers raise prices, not rebates. PBMs help get the lowest net cost for their clients and consumers. Claims that 'higher rebates mean higher prices' have been repeatedly debunked and repeatedly disproven."

- "Rebates are not secret or hidden payments. Our clients understand the rebates we secure and have the choice to determine how these cost savings are used. More specifically, ***clients receive detailed financial disclosures, which include rebate arrangements with pharmaceutical manufacturers, as well as administrative fees for services provided.*** Further, all Express Scripts' clients have an annual right to audit our performance and adherence to contract terms using an independent third-party auditor."

- "Rebates help defray ever-rising drug costs for Express Scripts clients and consumers"

163. Another page on Evernorth's website, titled "Delivering Value and Affordability to Consumers," also published at least as early as April 15, 2024, and available as of the filing of this Complaint, states:

- "Express Scripts relentlessly advocates on behalf of our clients and their members to make lifesaving therapies and medications more affordable."

- "Express Scripts and other PBMs work to evaluate a drug's clinical effectiveness and negotiate lower costs to help drive out-of-pocket savings for patients—by $1,040 annually, on average."

164. Evernorth's website page titled "How a PBM Works," also published at least as early as April 15, 2024, and available as of the filing of this Complaint, states:

- "Express Scripts, and other PBMs, are essential partners across the drug supply chain—helping drive down drug spend and improve medication access for clients and customers."

- "PBMs like Express Scripts help clients put money back into consumer wallets."

- "PBMs lower the cost of generics, branded and specialty drugs to deliver more savings and provide greater access to medications and life-saving therapies for consumers and clients."

- "PBMs keep other players in the drug supply chain in check"

- "Express Scripts negotiates with drug companies to lower the cost of medications included on our clients' formularies."

- "Today, high prescription drug costs are often incorrectly blamed on PBMs. But facts are facts: it is not PBMs but others in the supply chain, starting with pharmaceutical manufacturers, who are solely responsible for setting and raising drug prices."

165.   Evernorth's website page, titled "The Truth About High Drug Prices," also published at least as early as April 15, 2024, and available as of the filing of this Complaint, states:

- "PBMs are not the cause of increasing drug costs;"

- "Studies and analyses clearly show drug price increases are not caused by PBMs like Express Scripts;"

- "[That the increase in drug prices] starts with pharmaceutical companies, which have steadily raised prices"

- "Over the years, drug manufacturers have increased list prices"

- "The PBM industry is innovating solutions to lower the cost of their drugs through rebates and other programs—providing clients with options to finance pharmacy benefits and ensuring consumers can access affordable medications and often life-sustaining or life-saving therapies."

- "PBMs provide benefits at a cost that is significantly lower than the value they bring to the health care system."

166.   Another page on Evernorth's website, entitled "Driving Drug Competition to Lower Costs," also published at least as early as April 15, 2024, and available as of the filing of this Complaint, states:

- "***PBMs drive drug competition by: using formulary placement to prefer drugs that drive the lowest net costs***; implementing drug utilization management programs that encourage the adoption of lower-cost, clinically equivalent options; developing products and solutions that incentivize utilization of lower-cost products; and encouraging pharmacies to dispense lower-cost alternatives where appropriate."

- "Express Scripts has long advocated for greater adoption of biosimilars because the competition they bring to the market enables us to drive greater savings for the

48

nearly 100 million Americans we serve."

- "PBMs [like Express Scripts] create a more competitive drug marketplace."

167.    A different page on Evernorth's website entitled "Group Purchasing Organizations

and Ascent," also published at least as early as April 15, 2024, and available as of the filing of this

Complaint, states:

- "In 2019, in response to out-of-control drug price inflation by pharmaceutical manufacturers, Express Scripts and a co-founder launched a GPO called Ascent. It has several participants—PBMs, health plan and pharmacy participants—*who work together and aggregate purchasing volume to negotiate greater savings from pharmaceutical manufacturers*."

168.    Another Evernorth website page, entitled "A Look at Administrative Fees," also

published at least as early as April 15, 2024, and available as of the filing of this Complaint, states:

- "Transparency is built into all of our pricing models with clients."

- "*Express Scripts provides a detailed disclosure to clients of administrative fees, as well as its principal revenue sources, including rebate arrangements with pharmaceutical manufacturers and pharmacy claim insights.*"

169.    Evernorth's website includes a page called "The Facts About Express Scripts," also

published at least as early as April 15, 2024, and available as of the filing of this Complaint, which

states:

- "Express Scripts lowers the cost of prescription drugs in four ways: (1) We create safe, affordable access to medications across our network of nearly 64,000 pharmacies with nearly every member within a 15-minute drive of an in-network retail pharmacy, including more than 20,000 independent pharmacies across the country; (2) We negotiate with pharmaceutical manufacturers who set the price of prescription drugs—driving competition to deliver lower net costs for clients and consumers; (3) We support clients on the creation of formularies—or lists of drugs—that include safe, effective and affordable medications for their covered populations; (4) We provide clinical expertise and programs that help people get and stay on the medications they need—preventing disease progression and helping people live their healthiest lives"

170.    Evernorth's website page entitled "The Value Express Scripts Delivers," also

published at least as early as April 15, 2024, and available as of the filing of this Complaint, states:

- "A prescription drug doesn't work if it's priced out of reach" and assured potential customers that "Express Scripts fights to ensure clients and consumers have access to safe, effective and affordable medications and life-sustaining or life-saving therapies."

171. These public statements reiterating that Express Scripts tirelessly and transparently works towards lowering drug cost for ESI PBM customers, that Defendants do not drive up drug costs, and that Defendants' formulary design and rebate decisions both favor ESI PBM customers and are not based on Defendants' own financial incentives, were all materially false and misleading.

172. In truth, throughout the Class Period, even after public scrutiny, Defendants continued to extract kickbacks from drug companies in return for favorable formulary placements and exclusion of lower-cost competing drugs, and Defendants directed drug companies to divert the payments to Ascent to avoid sharing them with ESI PBM customers, despite attempting to speak out against the public scrutiny they were facing.

**D. Express Scripts Falsely Told Plumbers' Welfare Fund and Other ESI PBM Customers That Its Formulary and Rebate Decisions Were Based on Helping Customers Control Costs and Achieve Significant Savings**

173. In communications with its ESI PBM customers, Express Scripts reiterated the same misrepresentations about its formulary design and rebate decisions. Specifically, Express Scripts routinely told ESI PBM customers that it would design and manage drug formularies and negotiate with manufacturers to secure rebates to lower ESI PBM customers' drug expenditures, and that it would be transparent about payments from drug companies.

174. In a 2015 presentation, for example, Express Scripts promised Plumbers' Welfare Fund that it would achieve significant cost savings by adopting Express Scripts' National Preferred Formulary because Express Scripts would engage in "ongoing formulary management," such as

promptly replacing high-cost drugs with low-cost equivalents. Such promises were emblematic of Express Scripts' marketing of its PBM services throughout the Class Period.

175. Similarly, when Express Scripts responded to a request for proposal ("RFP") from the San Antonio Independent School District in 2018, it made representations about utilizing its negotiating power to obtain significant savings for the school district. The September 2018 San Antonio Independent School District board meeting minutes show that the employment benefit committee for the school district recommended the selection of Express Scripts as its PBM based on its RFP response concerning "best discounts."

176. Express Scripts made the same types of representations in 2021 when it sought to serve as the PBM for the State of Ohio Department of Medicaid ("Ohio Medicaid"). For example, Tim Wentworth, the then-CEO of Express Scripts, claimed in a letter to Ohio Medicaid that "[c]lients trust us to control their costs and improve member outcomes." In its "Technical Proposal" to Ohio Medicaid, Express Scripts described its approach to "pharmacy benefit management" as involving "improved transparency . . . while cutting costs for pharmacy benefits[.]"

177. Express Scripts also promised in its Technical Proposal that it would "ensure . . . no adverse influence from pharmaceutical manufacturers, wholesalers, and retail pharmacies, and . . . to put the best interest of [Ohio Medicaid] and its Medicaid members first and drive out healthcare waste."

178. Further, in an effort to emphasize to Ohio Medicaid its supposed aversion to bribe and kickback arrangements and commitment to ethical conduct, Express Scripts included in its proposal a copy of its Code of Conduct, which stated, among other things:

- "It's our responsibility to understand and uphold these anti-kickback laws in order to ensure a safe, effective, and efficient healthcare system."

- "Submission of false, fraudulent, or misleading information to any government agency or third-party payer to gain or retain participation in a program, or obtain payment for a service, isn't acceptable at Express Scripts or by law. Like anti-kickback laws, various other state and federal fraud, waste and abuse laws are in place to promote safety and efficiency in our healthcare system."

- "[Express Scripts] [p]roactively promotes ethical and honest behavior within Express Scripts and its subsidiaries and affiliates."

179.    Finally, as evidence of its purported dedication to "helping clients save on total healthcare costs," Express Scripts touted its use of data analytics to reduce costs:

- "With our extensive expertise and experience in integrating data, Express Scripts provides the unique ability to provide integrated reporting that allows clients to truly see a full picture of their population. A holistic view of the patient is essential in providing education to members that enable a better member experience and improved therapy decisions, which help to close gaps in care, and measure both healthcare outcomes and your cost savings."

- "At Express Scripts, we use integrated data to fuel insights and innovation that lead to new solutions and better patient care. To that end, we have developed industry-leading, evidence-based solutions that provide advanced patient safety interventions while helping clients save on total healthcare costs."

- "Express Scripts' partnership with Rx Savings Solutions, a company focused on empowering members to save money on their prescription medications, helps both members and clients save money by driving efficiencies in the prescription claims process–clinically and via optimal fulfillment channels."

180.    In July 2022, when it responded to an RFP from another potential ESI PBM customer, the San Joaquin Valley Insurance Authority, Express Scripts made the same promises of lowering drug spending and transparency, including:

- "At Express Scripts, we're working to solve for these challenges differently, because we see a better path forward to make healthcare more affordable, predictable, and simple for those we serve."

- "At the core of our proposal for San Joaquin Valley Insurance Authority, we promise to manage drug spend and lower the total cost of care for San Joaquin Valley Insurance Authority and your members, without sacrificing quality of care."

- "[W]e will keep San Joaquin Valley Insurance Authority on the cutting edge of technology in healthcare, dynamically evolving your plan and sharing

new technologies with you as the healthcare landscape shifts to help you make healthcare affordable, predictable, and simple for your members."

181. Similarly, in a pre-Class Period presentation to the South Carolina Public Employee Benefit Authority ("PEBA"), Express Scripts promised "Increased savings" as part of its offer to "Reduc[e] Waste for Plan Sponsors." PEBA documents reflect that "PEBA transitioned to Express Scripts' National Preferred Formulary" because it "allows the State Health Plan to achieve the lowest net cost for covered prescriptions." Thereafter, and throughout the Class Period, Express Scripts provided periodic updates touting the savings Express Scripts provided to PEBA. For example, at an August 25, 2022, meeting of the PEBA Board of Directors, Express Scripts presented about "rebates; discounts and subsidies" and touted the millions of dollars in savings achieved for PEBA. At an August 29, 2024, meeting of the PEBA Board, Express Scripts discussed pharmaceutical pricing and opportunities to mitigate the cost of specialty drugs.

182. The above statements, and similar statements made to ESI PBM customers, were materially false and misleading. Among other things, contrary to these representations, Defendants did not prioritize PBM customers' cost savings or the affordability of health care; doing so would have required negotiating with drug companies to maximize the rebates that lowered drugs costs and, instead of doing so, Defendants' Formulary Manipulation Scheme centered on funneling to Ascent funds that should have been paid as rebates to ESI PBM customers. Moreover, Express Scripts' touting of its Code of Conduct and the "ethical and honest behavior" mandated by that Code was misleading in that the Formulary Manipulation Scheme was patently contrary to multiple aspects of that Code of Conduct.

183. Additionally, Express Scripts sends periodic statements to Plumbers' Welfare Fund, and its other PBM customers, reporting to on rebates received and highlighting their increased savings on drug spend. These periodic statements are false and misleading because Express Scripts

53

represented that these statements disclosed all rebates and all savings achieved during the reporting periods. In reality, Express Scripts concealed the Formulary Manipulation Scheme, which diverted monies that should have been considered rebates to Ascent and excluded savings that would have been realized had Express Scripts prioritized savings for its PBM customers in its formulary management decisions, rather than drug companies that provide Express Scripts with bribes and kickbacks.

184. For example, most recently, Express Scripts sent Plumbers' Welfare Fund a "Strategic Planning and Review Consultation" for the period from January 2025 through June 2025 in which Express Scripts touted the savings that it achieved for Plumbers' Welfare Fund.

185. In this document, Express Scripts reported that in the first half of 2024, Plumbers' Welfare Fund received $2,721,583 in rebates, whereas in the first half of 2025, Plumbers' Welfare Fund received $2,940,149 in rebates, representing an 8% growth in rebates. These statements are misleading because they understate the rebates to which Plumbers' Welfare Fund was entitled by failing to account for monies paid from drug companies to Ascent. Express Scripts failed to disclose that Plumbers' Welfare Fund would have received much higher rebates, in both the first half of 2024 and the first half of 2025, if Express Scripts had not misclassified rebates as other types of fees to divert monies to Ascent.

186. Further, in the same document, Express Scripts claimed that, when comparing the first half of 2024 to the first half of 2025, Plumbers' Welfare Fund's savings from "Formulary Related Programs" increased by 159%, while savings from "Advanced Utilization Management" increased by 1.6%. However, had Express Scripts prioritized placing low cost drugs on Plumbers' Welfare Fund's formulary, rather than making decisions based on which drug company would pay

Express Scripts bribes and kickbacks, Plumbers' Welfare Fund's savings would have been much higher in both the first half of 2024 and the first half of 2025.

187.     Additionally, "Express Scripts Rebate Program Management" sends statements titled "Rebate Allocation" to Plumbers' Welfare Fund and other of its PBM customers. In these documents, Express Scripts specifically states "[w]e are pleased to report that this allocation represents your rebate payment savings based on the prescriptions filled by your members and your contractual rebate arrangement with Express Scripts." These reports are misleading because Express Scripts directly represents that these reports reflect its customers' entire rebate payment savings.

188.     For example, on November 12, 2025, Express Scripts reported to Plumbers' Welfare Fund that from October 1, 2023, through December 31, 2023, Plumbers' Welfare Fund received a rebate payment of $1,418,970.

189.     This statement is misleading because Express Scripts failed to disclose that Plumbers' Welfare Fund would have had a much higher rebate payment but for Defendants' diversion of monies to Ascent in furtherance of the Formulary Manipulation Scheme.

190.     Moreover, the promises that Express Scripts made to Plumbers' Welfare Fund, other ESI PBM customers, and potential customers about its lack of improper influence, aversion to bribes and kickbacks, rebate payment transparency, and designing of formularies to prioritize low drug costs were materially false and misleading.

## VI.  DEFENDANTS HAVE ESTABLISHED AND OPERATED RICO ENTERPRISES IN FURTHERANCE OF THEIR FRAUDULENT SCHEME

191.     To orchestrate their fraudulent scheme, Defendants created, controlled, and operated bilateral association-in-fact RICO enterprises with nearly all major drug companies. Through those enterprises, the drug companies agreed to pay bribes and kickbacks, misleadingly

described as an array of fees to Ascent, in return for access to Express Scripts' PBM customers through the drug formularies and favorable formulary placements for their high-cost, brand-name drugs.

192.    Each enterprise consists of, on one hand, the Cigna entities (Defendants and non-party Ascent), and, on the other hand, a participating drug company:



193.    These RICO enterprises are separate and ongoing business associations that facilitated the coverage determinations, reimbursements, and rebate payments for the drug companies' prescription medications.

194.    Further, the drug companies participating in these RICO enterprises were aware of Express Scripts' public statements about its responsibilities as a PBM. Specifically, the drug companies knew that they were supposed to have arm's-length relationships with Express Scripts because Express Scripts' role was to pursue vigorous rebate negotiations with the drug companies on behalf of ESI PBM customers.

195.    In reality, however, the Defendants, non-party Ascent, and each participating drug company have, through each RICO enterprise, continuously pursued a shared unlawful purpose: Express Scripts would give formulary access and favorable formulary placements to the drug company's medications while excluding competing drugs, in return for the drug company agreeing

to make payments to Ascent, for the benefit of the Defendants and at the expense of Express Scripts' PBM customers like Plumbers' Welfare Fund and other class members. Drug companies knew or should have known that paying such fees to Ascent would enable Defendants to avoid classifying such fees as rebates, and thereby helped Defendants eliminate or materially reduce the amounts Defendants passed on to Plumbers' Welfare Fund and the Class.

196.    The PBM Fraud Enterprises include, but are not limited to:

a)  The **Cigna-AbbVie Enterprise**, in which Defendants and non-party Ascent have associated with AbbVie to facilitate coverage determination, reimbursement, and rebate payments for AbbVie's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for AbbVie drugs including Humira, Linzess, Rinvoq, and Skyrizi.

b)  The **Cigna-Amgen Enterprise,** in which Defendants and non-party Ascent have associated with Amgen to facilitate coverage determination, reimbursement, and rebate payments for Amgen's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Amgen drugs including Enbrel, Repatha, and Otezla.

c)  The **Cigna-AstraZeneca Enterprise,** in which Defendants and non-party Ascent have associated with AstraZeneca to facilitate coverage determination, reimbursement, and rebate payments for AstraZeneca's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for AstraZeneca drugs including Symbicort, Farxiga, Calquence, Lynparza, Tagrisso, Brilinta, and Lokelma.

d)  The **Cigna-Bayer Enterprise,** in which Defendants and non-party Ascent have associated with Bayer to facilitate coverage determination, reimbursement, and

57

rebate payments for Bayer's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Bayer drugs including Xarelto, Eylea, Stivarga, Vitrakvi, Kyleena, and Nubeqa.

e) The **Cigna-BMS Enterprise,** in which Defendants and non-party Ascent have associated with BMS to facilitate coverage determination, reimbursement, and rebate payments for BMS's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for BMS drugs including Eliquis, Revlimid, Abilify, Sprycel, and Zeposia.

f) The **Cigna-Boehringer Enterprise,** in which Defendants and non-party Ascent have associated with Boehringer to facilitate coverage determination, reimbursement, and rebate payments for Boehringer's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Boehringer drugs including Tradjenta, Glyxambi, Jardiance, Spiriva, and OFEV.

g) The **Cigna-Eli Lilly Enterprise,** in which Defendants and non-party Ascent have associated with Eli Lilly to facilitate coverage determination, reimbursement, and rebate payments for Eli Lilly's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Eli Lilly drugs including Trulicity, Humalog, and Humulin.

h) The **Cigna-Gilead Enterprise,** in which Defendants and non-party Ascent have associated with Gilead to facilitate coverage determination, reimbursement, and rebate payments for Gilead's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Gilead drugs including Biktarvy, Descovy, Harvoni, and Vosevi.

i)  The **Cigna-J&J Enterprise,** in which Defendants and non-party Ascent have associated with J&J to facilitate coverage determination, reimbursement, and rebate payments for J&J's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for J&J drugs including Tremfya, Stelara, Erleada, and Darzalex.

j)  The **Cigna-Merck Enterprise,** in which Defendants and non-party Ascent have associated with Merck to facilitate coverage determination, reimbursement, and rebate payments for Merck's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Merck drugs including Keytruda, Gardasil, Verquvo, Januvia, Steglujan, Zepatier, and Steglatro.

k)  The **Cigna-Novartis Enterprise,** in which Defendants and non-party Ascent have associated with Novartis to facilitate coverage determination, reimbursement, and rebate payments for Novartis's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Novartis drugs including Gilenya, Entresto, Kesimpta, Jakafi, Tasigna, and Xolair.

l)  The **Cigna-Novo Nordisk Enterprise,** in which Defendants and non-party Ascent have associated with Novo Nordisk to facilitate coverage determination, reimbursement, and rebate payments for Novo Nordisk's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Novo Nordisk drugs including Wegovy, Xultophy, Victoza, Ozempic, Tresiba, and Ryzodeg.

m) The **Cigna-Pfizer Enterprise,** in which Defendants and non-party Ascent have associated with Pfizer to facilitate coverage determination, reimbursement, and rebate payments for Pfizer's drug products and to carry out an unlawful

agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Pfizer drugs including Eliquis, Ibrance, Lipitor, Vyndaqel, Lyrica, and Xeljanz.

n) The **Cigna-Sanofi Enterprise,** in which Defendants and non-party Ascent have associated with Sanofi to facilitate coverage determination, reimbursement, and rebate payments for Sanofi's drug products and to carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements for Sanofi drugs including Dupixent, Toujeo, Lantus, and Soliqua.

197. Each of these RICO enterprises has existed as a business association separate from the pattern of unlawful racketeering activities alleged. Each RICO enterprise, for example, engaged in prescription drug coverage determination, prescription drug reimbursement, and drug rebate payment activities separate and apart from its involvement in Defendants' scheme of accepting bribe and kickback payments in return for favorable formulary placements.

198. Alongside these non-racketeering activities, however, the participants in each of these RICO enterprises have been bound together by unlawful agreements and understandings about the payment of bribes and kickbacks in return for favorable formulary placements and the diversion of drug rebates from Express Scripts' PBM customers to Ascent.

199. Specifically, each drug company participating in each RICO enterprise has agreed to pay fees to Ascent in exchange for access, and often preferred access via favorable formulary placement, to Express Scripts' PBM customers. While those fees are nominally described to ESI PBM customers as being for data collection, rebate administration, and similar services, they are in fact bribes and kickbacks intended to benefit Defendants in return for Express Scripts granting favorable formulary placements to each drug company's brand-name, high-priced medications.

200.    Further, as an aspect of each RICO enterprise, Defendants, non-party Ascent, and the participating drug company also agreed and understood that the payment of exorbitant fees to Ascent by the drug company would directly result in reductions to the amount of rebates and discounts that Express Scripts shared with Plumbers' Welfare Fund and the Class.  In other words, the drug company and Ascent understood that the fees paid to Ascent for formulary access were contrary to Express Scripts' obligations and representations to Plumbers' Welfare Fund and the Class because they diverted payments that would otherwise be shared with them.

201.    In furtherance of these unlawful agreements and understandings, the participants in each of the RICO enterprises communicated and coordinated their actions, including through discussions about how to structure the bribe and kickback payments to Defendants, the amounts of such unlawful payments, and the formulary placements that Express Scripts would assign to each participating drug company's drugs in return for the unlawful payments.

202.    By leveraging Express Scripts' negotiating power as the PBM for Plumbers' Welfare Fund and the Class, Defendants have controlled and operated each of these RICO enterprises, including by directing the flow of the unlawful bribes and kickbacks to Ascent and by giving favorable formulary placements to each participating drug company's medications.

203.    Finally, in furtherance of Defendants' unwritten, unlawful agreements with the drug companies participating in these RICO enterprises, Defendants, in their role as key participants in each of the PBM Fraud Enterprises, have consistently and repeatedly made misrepresentations and omitted material facts to Plumbers' Welfare Fund and the Class.

204.    Specifically, Defendants, rather than disclosing that Express Scripts' formulary placement decisions were made in return for bribes and kickbacks from the participating drug companies, have falsely represented to Plumbers' Welfare Fund and the Class that formulary

decisions have been made to help manage or reduce those PBM customers' prescription drug expenditures and that they were receiving all the rebates and administrative fees due to them pursuant to their contracts with Express Scripts.

### A. In Furtherance of Defendants' Fraudulent Scheme, Each of the PBM Fraud Enterprises Made False and Misleading Statements

205. To execute the Formulary Manipulation Scheme, each of the PBM Fraud Enterprises has made and used numerous false and misleading statements and records during the Class Period, including, but not limited to:

    a) Defendants' misrepresentations to Plumbers' Welfare Fund and the Class and the public that Express Scripts managed its standard drug formularies with the goal of lowering drug costs for its PBM customers;

    b) Defendants' misrepresentations that the "preferred" status in Express Scripts' standard formularies was based only on the drugs' safety, efficacy, and/or cost-effectiveness, as determined by the Express Scripts' formulary committees;

    c) Defendants' misrepresentations to Plumbers' Welfare Fund and the Class and the public that Express Scripts conducted rebate negotiations with drug companies—including, specifically, the drug companies participating in the PBM Fraud Enterprises—to reduce ESI PBM customers' prescription drug expenditures;

    d) Defendants' misrepresentations to Plumbers' Welfare Fund and the Class and the public that Express Scripts was transparent regarding its negotiations with drug companies, including the drug companies participating in the PBM Fraud Enterprises, and payments from those drug companies;

e) False or misleading rebate agreements between Express Scripts and the drug companies participating in the PBM Fraud Enterprises that improperly conceal the material fact that the drug companies were receiving favorable formulary placements in return for bribes and kickbacks paid to Ascent;

f) False or misleading agreements between Ascent and the drug companies participating in the PBM Fraud Enterprises that wrongly attributes the inflated fees paid by the drug companies to services actually rendered by Ascent, rather than as bribes and kickbacks in return for favorable formulary placements; and

g) False or misleading periodic statements sent from Express Scripts to Plumbers' Welfare Fund and the Class purporting to identify all rebates Plumbers' Welfare Fund and the Class had been entitled to receive in connection with drug purchases.

## VII. EXPRESS SCRIPTS BREACHED ITS OBLIGATION TO TREAT ITS PBM CUSTOMERS FAIRLY AND IN GOOD FAITH

206. In addition to the obligations specified in its PBM contracts with ESI PBM customers, Express Scripts has an additional obligation to treat its PBM customers fairly and in good faith. As relevant here, this encompasses an obligation not to drive up ESI PBM customers' prescription drug costs either by diverting payments from drug companies to Ascent, selling formulary access and favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies, or excluding cost-effective drugs from the formularies because they compete with and/or cost less than the drugs made by Defendants' co-conspirators.

207. This obligation is clear from Express Scripts' Code of Conduct, which has consistently defined its "mission" as a PBM as "mak[ing] the use of prescription drugs safer and

63

more affordable." Similarly, in congressional testimony, Express Scripts' top executives have asserted under oath that Express Scripts' role as a PBM is "negotiating with large pharmaceutical manufacturers to lower the costs of drugs for employers [and] health plans[.]"

208. According to Express Scripts' explanation of "What's a Pharmacy Benefit Manager" on its own website, "PBMs [like Express Scripts] add value" to their customers by designing drug formularies that "provide better care and lower costs[.]" Express Scripts' website further assured ESI PBM customers that its formulary decisions "direct . . . members to lower-cost medications" and, thereby, "saving $3.2 billion" for its customers.

209. As alleged above, Express Scripts systematically and continually abused its position of trust and violated its obligation to treat its ESI PBM customers fairly and in good faith by giving favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies to its affiliate, Ascent. This conduct diverted rebates, that would otherwise have been passed on to Plumbers' Welfare Fund and the Class pursuant to their contracts with Express Scripts, to Ascent.

## VIII.  CLASS-ACTION ALLEGATIONS

210. Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2) and (b)(3) on behalf of a class consisting of:

> All entities in the United States of America and its territories, including health insurance companies, health maintenance organizations, self-funded health and welfare benefit plans, third party payors, and any other health benefit providers, that paid or incurred costs for Express Scripts' pharmacy benefit manager services that were inflated as a result of Defendants' fraudulent scheme, from April 15, 2019, through the present, and suffered damages thereby. Excluded from the Class are (i) employees of Defendants, including their officers or directors, and subsidiaries and affiliates; and (ii) successors or assigns, and any entity in which Defendants have or had a controlling interest.

211. The members of the Class are so numerous that joinder of all members is impracticable. The Class consists of all ESI PBM customers, including health insurance

companies, health maintenance organizations, self-funded health and welfare benefit plans, and any other health benefit providers in the United States that did not receive the benefits of the PBM services they paid for and were wrongfully induced to pay higher costs for PBM-related services as a consequence of Defendants' fraudulent scheme during the Class Period. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class. Class members may be identified from records maintained by Defendants and may be notified of this class action using a form of notice similar to that customarily used in class actions.

212. Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of in this action.

213. Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and in RICO and fraud-related litigation.

214. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

    a) whether Defendants' acts and omissions violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);

    b) whether Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d);

    c) whether Defendants disseminated false or misleading statements to conceal that the PBM Fraud Enterprises were secretly profiting at the expense of ESI PBM customers;

d)  whether Defendants controlled and manipulated formularies to incentivize higher-priced drugs;

e)  whether Defendants misclassified drugs as "specialty" to incentivize higher-priced drugs;

f)  whether Defendants mischaracterized and reclassified rebates to hide the substantial sums being exchanged and pocketed by their PBM and affiliated GPO;

g)  whether Defendants created a foreign GPO to conceal rebates and fees from Express Scripts' customers;

h)  whether Defendants' acts and omissions described in this Complaint constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1962;

i)  whether Defendants administered an "enterprise," within the meaning of 18 U.S.C. § 1962;

j)  whether Defendants' acts or omissions described in this Complaint affected interstate commerce;

k)  whether Defendants' acts or omissions described in this Complaint were in breach of their contractual obligations to the Class;

l)  whether Defendants' acts or omissions described in this Complaint were in breach of an implied covenant of good faith and fair dealing; and

m)  whether Defendants' acts or omissions described in this Complaint directly and proximately caused injury to Plaintiff and the Class.

215.  Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is available respecting the Class as a whole.

216.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small, so that the burden and expense of individual litigation makes it impossible for those members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## IX.     CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)—RACKETEERING

217.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 216 above, as fully set forth here.

218.     18 U.S.C. § 1962(c) provides, in relevant part:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity [. . .]"

219.     Defendants Cigna, Evernorth, and Express Scripts are "persons" within the meaning of 18 U.S.C. § 1962(c), because each is an "entity capable of holding a legal or beneficial interest in property[.]" *See* 18 U.S.C. § 1961(3).

220.     The PBM Fraud Enterprises are association-in-fact enterprises consisting of, on one hand, the Defendants and non-party Ascent, and, on the other hand, nearly all major drug companies that have paid bribes and kickbacks to Ascent in exchange for access to favorable placement on Express Scripts' formularies.  As set forth above, *see supra* ¶¶191-204, the PBM Fraud Enterprises have included, but are not limited to:

a)  the Cigna-AbbVie Enterprise

67

b) the Cigna-Amgen Enterprise

c) the Cigna-AstraZeneca Enterprise

d) the Cigna-Bayer Enterprise

e) the Cigna-BMS Enterprise

f) the Cigna-Boehringer Enterprise

g) the Cigna-Eli Lilly Enterprise

h) the Cigna-Gilead Enterprise

i) the Cigna-J&J Enterprise

j) the Cigna-Merck Enterprise

k) the Cigna-Novartis Enterprise

l) the Cigna-Novo Nordisk Enterprise

m) the Cigna-Pfizer Enterprise

n) the Cigna-Sanofi Enterprise

221.    While each PBM Fraud Enterprise is involved in certain legitimate activities such as facilitating drug coverage determination, reimbursement, and rebate payments, each PBM Fraud Enterprise also has, during the Class Period, operated with at least one key unlawful purpose: to channel bribes and kickbacks from the participating drug company to Defendants through Ascent, under the disguise of "rebate administration" and other fee payments, in return for benefits that may include formulary access, favorable formulary placements, or exclusion of competing drugs.

222.    Defendants Cigna, Express Scripts, Evernorth are separate legal entities, and Defendants are each distinct from each of the PBM Fraud Enterprises.

### A.    Defendants' Conduct of the PBM Fraud Enterprises' Affairs

223.    In 2019, at the start of the Class Period, Defendant Cigna and Defendant Express Scripts were directly involved in establishing each of the PBM Fraud Enterprises.  Specifically,

68

Defendants created Ascent as a subsidiary which later joined Cigna's Evernorth division as a sister company to Express Scripts in order to use Ascent as the channel through which payments from the participating drug companies can be diverted into Defendants' coffers without disclosure or proper payment to ESI PBM customers like Plumbers' Welfare Fund.

224. Throughout the Class Period, Defendants Cigna, Express Scripts, and Evernorth each has exerted control over each of the PBM Fraud Enterprises by leveraging Express Scripts' ability to control the drug formularies for Plumbers' Welfare Fund and the Class and, thereby, determine how likely the brand-name drugs marketed by each of the participating drug companies is to be used by beneficiaries of ESI PBM customers.

225. Further, Defendants Cigna, Express Scripts, and Evernorth each have conducted or participated in the specific aspects of the affairs of each of the PBM Fraud Enterprises, including by:

> a) Demanding and obtaining bribes and kickbacks from each participating drug company in return for giving favorable formulary placements to one or more of that drug company's brand-name, high-priced drugs on Express Scripts' formularies;
>
> b) Excluding drugs from formularies to limit competition and/or remove lower-cost alternatives for the drugs made by Defendants' co-conspirators;
>
> c) Misrepresenting and/or concealing from both Plumbers' Welfare Fund and the Class and the public the real reasons for Express Scripts' formulary placement decisions;
>
> d) Channeling the bribes and kickbacks into Defendants' coffers through Ascent by creating agreements and records that falsely characterize the bribes and

kickbacks as rebate administration and other fees paid to Ascent for bona fide services;

e) Misrepresenting and/or concealing from both Plumbers' Welfare Fund and the Class and the public Express Scripts' actual goals in its rebate negotiations with the drug companies that have participated in the PBM Fraud Enterprises; and

f) Misrepresenting to Plumbers' Welfare Fund, the Class, and the public the transparency of Express Scripts' rebate negotiations and its fee arrangements with the participating drug companies.

**B. Defendants' Pattern of Racketeering Activity**

226. Defendants Cigna, Express Scripts, and Evernorth each have conducted and participated in the affairs of the each of the PBM Fraud Enterprises through a pattern of racketeering activity under 18 U.S.C. § 1961.

227. Specifically, Defendants Cigna, Express Scripts, and Evernorth each have committed or aided and abetted the commission of numerous acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. § 1343, within the past 10 years.

228. Defendants Cigna's, Express Scripts', and Evernorth's predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) consisted of violations of the wire fraud (18 U.S.C. § 1343) statutes.

229. Specifically, in furtherance of their fraudulent scheme, Defendants Cigna, Express Scripts, and Evernorth directed each of the PBM Fraud Enterprises to engage in and affect interstate commerce by conducting activities across state boundaries, which include, but are not limited to: negotiating agreements concerning fees, rebates, and formulary placements; communicating with ESI PBM customers like Plumbers' Welfare Fund about prescription drug

costs, formulary design, and rebates; and transmitting and receiving invoices and data concerning prescription drug coverage, reimbursements, and fee and rebate payments.

230. Through these activities, Defendants Cigna, Express Scripts, and Evernorth participated in prescription drug coverage determinations, prescription drug reimbursements, and fees and rebate payments affecting ESI PBM customers and their beneficiaries throughout the United States, including in this District.

231. To execute their fraudulent scheme and to carry out the activities in furtherance of their fraudulent scheme, Defendants Cigna, Express Scripts, and Evernorth caused each of the PBM Fraud Enterprises to regularly transmit documents, data, and other information using interstate wire facilities. Among other things, each of the PBM Fraud Enterprises used the interstate wire facilities to transmit the following types of communications:

a) Written and oral communications among members of each PBM Fraud Enterprise conditioning, negotiating, and confirming the payment of bribes and kickback to Defendants through Ascent in return for favorable formulary placements;

b) Written agreements between Ascent and the participating drug company in each PBM Fraud Enterprise that falsely and/or misleadingly conceal the true purpose of the payments to Ascent under those agreements: to secure favorable formulary placements for the drug company;

c) Prescription benefit management contracts between Express Scripts and the Class that falsely and/or misleadingly conceal Express Scripts' side agreements with the drug companies that participate in the PBM Fraud Enterprises to give

favorable formulary placements in return for bribes and kickbacks to Defendants through Ascent;

d) Written communications, including checks, wires and/or other payment mechanisms, relating to purported "rebate administration" and other fee payments to Ascent, that were, in actuality, bribes and kickbacks from the drug companies participating in the PBM Fraud Enterprises to Defendants to secure favorable formulary placements; and

e) Invoices and other requests for payment from Express Scripts to Plumbers' Welfare Fund and the Class for covering prescription drugs for their beneficiaries.

f) Marketing materials and proposals sent to existing and potential PBM customers promising cost savings and periodic reports sent to existing customers regarding cost savings achieved and/or delivered by Express Scripts.

232. Through their control and participation in each of the PBM Fraud Enterprises, Defendants Cigna, Express Scripts, and Evernorth have regularly violated 18 U.S.C. § 1343 by conducting a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, using the interstate wire facilities. As alleged above, Defendants have done so by, *inter alia*, negotiating agreements concerning fees, rebates, and formulary placements; communicating with ESI PBM customers like Plumbers' Welfare Fund about prescription drug costs, formulary design, and rebates; transmitting and receiving invoices and data concerning prescription drug coverage, reimbursements, and fee and rebate payments; and making misrepresentations to Express Scripts' PBM customers like Plumbers' Welfare Fund

and the public about its rebate negotiation process, its formulary placement decisions, its sharing of rebates with ESI PBM customers, and the transparency of these processes and decisions.

233.    Defendants also have violated 18 U.S.C. § 1343 by using the interstate wire facilities to conceal both the corrupt bribe and kickback arrangements between Ascent and the drug companies participating in the PBM Fraud Enterprises by falsely and misleadingly labeling rebate payments from the drug companies as fee payments to Ascent and the amounts and nature of those payments from Plumbers' Welfare Fund, the Class, and the public.

234.    Defendants Cigna, Express Scripts, and Evernorth each knowingly and intentionally made or caused to be made the misrepresentations concerning the rebate negotiation process, Express Scripts' formulary placement decisions, the sharing of rebates with ESI PBM customers, the transparency of these processes and decisions to conceal these facts from Plumbers' Welfare Fund, the Class, and the public.  Defendants Cigna, Evernorth, and Express Scripts each knew or recklessly disregarded that these were material misrepresentations and/or omissions.

C.    **Defendants' Operation of the Formulary Manipulation Scheme Through the PBM Fraud Enterprises Injured, and Continues to Cause Injury to, Business or Property of Plumbers' Welfare Fund and the Class**

235.    Defendants' pattern of racketeering activity and violations of the wire fraud statute have caused each member of the Class, Express Scripts' PBM customers like Plumbers' Welfare Fund, to be injured in its business or property.

236.    By accepting bribes and kickbacks paid from drug companies to Ascent in exchange for access to and favorable placement of drugs on Express Scripts' formularies, Defendants diverted rebates and fees that would otherwise have been passed through to Plumbers' Welfare Fund and the Class.

237.    Additionally, by giving favorable formulary placements to high-price, brand-name drugs in return for bribes and kickbacks as part of their wire fraud scheme, Defendants have raised

prescription drug costs for Express Scripts' PBM customers. Plumbers' Welfare Fund and the Class have had to pay more to Express Scripts during the Class Period for prescription drug coverage for their beneficiaries, and received lower rebates and more restricted drug formularies from Express Scripts, than they would had Defendants not engaged in the Formulary Manipulation Scheme. Under 18 U.S.C. § 1964(c), Defendants Cigna, Express Scripts, and Evernorth are, respectively, jointly and severally liable to the Class for three times the damages that members of the Class have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

<u>COUNT II</u>

<u>VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)—RACKETEERING CONSPIRACY</u>

238. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 216 above as though fully set forth here.

239. The conspiracy provision of the RICO statute, 18 U.S.C. § 1962(d), states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

240. Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). Specifically, the object of the conspiracy has been and is to orchestrate a bribery and kickback fraud scheme through Defendants' control and operation of the PBM Fraud Enterprises.

241. As set forth in detail above, including, specifically, in the RICO allegations in paragraphs 191-204, Defendants each knowingly agreed to orchestrate the bribery and kickback fraud scheme through one or more of the PBM Fraud Enterprises; and each Defendant has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

242. Specifically, Defendants agreed to and received through Ascent inflated fees from the drug companies participating in the PBM Fraud Enterprises; Defendants agreed to and

provided, in return, favorable placements to the participating drug companies' high-price, brand-name drugs in Express Scripts' drug formularies; and Defendants repeatedly made false or misleading statements or material omissions concerning Express Scripts' formulary decisions and rebate negotiations.

243. The nature of each Defendant's acts, material misrepresentations, and material omissions in furtherance of this conspiracy creates an inference that each Defendant both agreed to participate in a RICO conspiracy in violation of 18 U.S.C. § 1962(c) and was aware that its ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

244. Each Defendant has systematically engaged in, and continues to engage in, the commission of overt predicate acts in furtherance of their bribery and kickback fraud scheme through the PBM Fraud Enterprises, including, but not limited, to violations of the wire fraud statute, 18 U.S.C. § 1343.

245. Defendants' conspiracy to engage in these systematic predicate violations are continuing and will continue. Plaintiff and the Class have been injured in their property by reason of Defendants' conspiracy and the predicate violations in furtherance of that conspiracy. Specifically, Defendants' RICO conspiracy has caused Plaintiff and the Class to pay more to Express Scripts for prescription drug coverage for their beneficiaries by reducing their shares of rebate and fee payments from drug companies and by driving up the cost of drug coverage.

246. By reason of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages they have sustained, plus the cost of this action, including reasonable attorneys' fees and costs.

## COUNT III

## BREACH OF CONTRACT

247.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 216 above, as though fully set forth here.  Defendant Express Scripts has breached its contracts with Plumbers' Welfare Fund and the Class.

248.    The contracts between Express Scripts and its PBM customers like Plumbers' Welfare Fund contain financial disclosure provisions, including a standard "Financial Disclosure to ESI PBM Clients."

249.    In its "Financial Disclosure to ESI PBM Clients," Express Scripts specifically stated that compensation from drug companies "is not considered for PBM formulary placement."

250.    For Plumbers' Welfare Fund, the "Financial Disclosure to ESI PBM Clients" has been incorporated into its Express Scripts, Inc. Pharmacy Benefit Management Agreement since the Fifth Amendment to that agreement in 2020.

251.    However, despite Express Scripts' repeated assurances to its PBM clients that it does not consider compensation from drug companies in formulary placement, Express Scripts used Ascent to secretly receive compensation, in the form of bribes and kickbacks, and such compensation directly impacted Express Scripts' formulary decisions.

252.    As such, Express Scripts' conduct in giving formulary access and favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies to its affiliate, Ascent, constitutes an express breach of Plumbers' Welfare Fund's Express Scripts, Inc. Pharmacy Benefit Management Agreement as well as Express Scripts' contracts with the other members of the Class.

253.    Furthermore, the contract's definition of "Rebates" excludes fees paid by pharmaceutical manufacturers to Express Scripts and its wholly-owned subsidiaries "for services

rendered as 'bona fide service fees' pursuant to federal laws and regulations […] Such laws and regulations, as well as [Express Scripts'] contracts with pharmaceutical manufacturers, generally prohibit [Express Scripts] from sharing any such 'bona fide service fees' earned by [Express Scripts], whether wholly or in part, with any [Express Scripts] client."

254.    The Express Scripts, Inc. Pharmacy Benefit Management Agreement, as amended, is a valid and binding contract between Express Scripts and Plumbers' Welfare Fund and is supported by consideration.

255.    Express Scripts' conduct in misclassifying payments from pharmaceutical manufacturers to Ascent as "bona fide service fees" constitutes a separate breach of contract because such fees far exceed the fair market value of any service that Ascent or Express Scripts provides to pharmaceutical manufacturers, and thus should have been classified as "rebates" under the contract and be shared with Plumbers' Welfare Fund and the Class.

256.    As a result, Plumbers' Welfare Fund and the Class have been damaged; and they are entitled to recover the diverted rebates that Defendants have misclassified as "bona fide service fees," and the higher costs they incurred due to formulary placements made by Express Scripts in return for the bribes and kickbacks from the drug companies received by Defendants, as well as interest thereon.

**COUNT IV**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

257.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 216 above, as though fully set forth here. Defendant Express Scripts has breached its implied covenant of good faith and fair dealing with Plumbers' Welfare Fund and the Class.

258.    Every contract includes an implied covenant of good faith and fair dealing.

77

259. Express Scripts used its discretion to create formularies for ESI PBM customers by giving favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies to its affiliate, Ascent, which constitutes bad faith and unfair dealing.

260. Specifically, Express Scripts violated the implied covenant of good faith and fair dealing because, instead of passing all rebates and manufacturer administrative fees paid by drug companies in connection with formulary access and placement, Express Scripts diverted those payments into Ascent's coffers.

261. As part of its contractual duty to design formularies for its PBM customers, Express Scripts was required to discharge its duties in good faith. But, instead of negotiating in good faith with pharmaceutical manufacturers on behalf of Plaintiff and the Class, Express Scripts used its discretion to design a pay-to-play scheme with drug companies that limited the drugs available on its formularies, excluding numerous drugs in favor of more expensive equivalents, which served only to enrich Express Scripts and drug companies at the expense of ESI PBM customers, including Plaintiff.

262. As a result, Plaintiff and the Class have been damaged and are entitled to recover the payments diverted to Ascent and the higher costs they incurred due to formulary placements made by Express Scripts in return for bribes and kickbacks, as well as interest thereon.

## COUNT V

## UNJUST ENRICHMENT

263. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 216 above, as though fully set forth here.

264. By giving formulary access and favorable formulary placements for high-price, brand-name drugs in return for drug companies diverting payments from Express Scripts to Ascent,

Defendants caused Plumbers' Welfare Fund and the class to overpay Express Scripts by improperly depriving Plumbers' Welfare Fund and the Class of their rightful share of the rebate and fee payments from drug companies.

265.    As a result, Defendants were unjustly enriched by their misconduct, and Plumbers' Welfare Fund and the Class conferred a benefit on Defendants solely because Defendants improperly caused drug companies to divert payments from Express Scripts to Ascent.

266.    Defendants understood, accepted, and retained the benefits conferred by Plumbers' Welfare Fund and the Class.  They also took steps to conceal the Formulary Manipulation Scheme while retaining the benefits derived from the scheme.

267.    It would be inequitable and unjust for Defendants to retain the benefits of their misconduct, including the payments they caused drug companies to divert from Express Scripts to Ascent.

268.    Plumbers' Welfare Fund and the Class have suffered financial harm from Defendants' misconduct and are entitled to damages, including the restitution and disgorgement of the payments that Defendants improperly diverted from Express Scripts to Ascent, in an amount to be established at trial, plus interest thereupon.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that this Court:

1.    Declaring the action to be a proper class action under Fed. R. Civ. P. 23;

2.    Awarding Plaintiff and the Class damages, in an amount to be proven at trial, including interest;

3.    Awarding Plaintiff and the Class their reasonable costs and expenses, including attorneys' fees; and

     4.     Awarding such other relief as the Court deems just and proper.

**XI.**   **JURY DEMAND**

     Plaintiff demands a trial by jury for all issues so triable.


Dated: February 17, 2026

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Joseph H. Meltzer
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
jmeltzer@ktmc.com
tziegler@ktmc.com


**CARELLA BYRNE CECCHI BRODY**
  **AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Zachary A. Jacobs
222 S. Riverside Plaza
Chicago, IL 60606
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
decklund@carellabyrne.com
zjacobs@carellabyrne.com

Respectfully submitted,

*/s/ Avi Josefson*
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN, LLP**
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 373-3800
Facsimile: (312) 794-7801
avi@blbglaw.com

-and

Michael D. Blatchley
Li Yu
Peter Russell
Haley J. Tobin
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
michaelb@blbglaw.com
li.yu@blbglaw.com
peter.russell@blbglaw.com
haley.tobin@blbglaw.com

**BISHOP PARTNOY**
ROBERT E. BISHOP
(bobby@bishoppartnoy.com)
FRANK PARTNOY
(frank@bishoppartnoy.com)
1717 K Street, NW, Suite 900
Washington, D.C. 20006
(202) 787-5769


*Counsel for Plumbers' Welfare Fund, Local
130 U.A. and the Class*