**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PLUMBERS' WELFARE FUND, LOCAL 130 U.A. | ) ) ) | |
| Plaintiff, | ) ) | No. 26 C 1718 |
| v. | ) ) | Hon. Martha M. Pacold |
| EXPRESS SCRIPTS, INC., EVERNORTH HEALTH SERVICES, and THE CIGNA GROUP, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................5

LEGAL STANDARDS................................................................................................................7

ARGUMENT ..............................................................................................................................9

I.     PLAINTIFF FAILS TO STATE A PLAUSIBLE RICO CLAIM .......................................9

     A.     Plaintiff Fails to Plausibly Allege a RICO Enterprise................................................9

          1.     Plaintiff Fails to Plausibly Allege a Common Purpose .............................10

          2.     Plaintiff Fails to Plausibly Allege an Enterprise Distinct from Racketeering .................................................................................................11

     B.     Plaintiff Fails to Plausibly Allege a Pattern of Racketeering Activity...................13

          1.     Plaintiff does not allege Defendants engaged in a pattern of activity for the supposed Formulary Manipulation Scheme ...................................14

          2.     Plaintiff does not have standing to pursue RICO claims for alleged overpayments..................................................................................15

          3.     Plaintiff cannot establish continuity for either alleged predicate act .........18

     C.     Plaintiff Fails to Allege Predicate Acts with Specificity........................................20

          1.     Plaintiff does not allege predicate acts with the particularity required by Rule 9(b) ...................................................................................20

          2.     Evernorth and Cigna are improperly lumped together with ESI................22

II.     PLAINTIFF FAILS TO PLAUSIBLY ALLEGE A RICO CONSPIRACY .....................23

III.     PLAINTIFF FAILS TO PLAUSIBLY ALLEGE A BREACH OF CONTRACT ............24

     A.     Plaintiff's Formulary Placement Argument Contradicts the Parties' Contract ..................................................................................................................24

     B.     Plaintiff's "bona fide services fees" Argument Cannot be Plausibly Alleged. ..................................................................................................................25

IV.     PLAINTIFF CANNOT PLAUSIBLY ALLEGE A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ...............................................27

V.     PLAINTIFF CANNOT PLAUSIBLY ALLEGE THAT DEFENDANTS WERE UNJUSTLY ENRICHED ..................................................................................................28

CONCLUSION..........................................................................................................................29

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................................7, 26

*Ashland Oil, Inc. v. Arnett,*
    875 F.2d 1271 (7th Cir. 1989)............................................................................18, 19

*Atkins v. Sharpe,*
    854 F. App'x 73 (7th Cir. 2021).................................................................................8

*Baker v. IBP, Inc.,*
    357 F.3d 685 (7th Cir. 2004) ...................................................................................10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................7, 26

*Bible v. United Student Aid Funds, Inc.,*
    799 F.3d 633 (7th Cir. 2015) ...................................................................................10

*Boyle v. United States,*
    556 U.S. 938 (2009)................................................................................................9, 10

*Browning v. Flexsteel Indus.,*
    955 F. Supp. 2d 900 (N.D. Ind. 2013) ....................................................................12

*Brownmark Films, LLC v. Comedy Partners,*
    682 F.3d 687 (7th Cir. 2012) .....................................................................................6

*Carter v. Berger,*
    777 F.2d 1173 (7th Cir. 1985) .................................................................................16

*Centene Corp. v. Indivior, Inc.,*
    2-20-cv-05014 (E.D. Pa. filed Sept. 21, 2020) .......................................................16

*Chaney v. Extra Space Storage Inc.,*
    No. 19-CV-05858, 2022 WL 4234969 (N.D. Ill. Sept. 14, 2022)...........................8

*City of Rockford v. Mallinckrodt ARD, Inc.,*
    360 F. Supp. 3d 730 (N.D. Ill. 2019) .......................................................................8

*Crichton v. Golden Rule Ins. Co.,*
    576 F.3d 392 (7th Cir. 2009) ..............................................................................12, 21

ii

*D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*,
No. 10 C 8159, 2013 WL 1286696 (N.D. Ill. Mar. 28, 2013)....................................................13

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ....................................................................................................20

*Dudley Enters., Inc. v. Palmer Corp.*,
822 F. Supp. 496 (N.D. Ill. 1993)........................................................................................13, 14

*Emalfarb v. Seminole Hard Rock Digital, LLC*,
No. 25 CV 12220, 2026 WL 215781 (N.D. Ill. Jan. 28, 2026) .................................................22

*Fiala v. Wasco Sanitary Dist.*,
No. 10 C 2895, 2012 WL 917851 (N.D. Ill. Mar. 16, 2012)....................................................16

*First Midwest Bank v. Cobo*,
2017 IL App (1st) 170872.........................................................................................................28

*Foshee v. Daoust Constr. Co.*,
185 F.2d 23 (7th Cir. 1950) ........................................................................................................8

*U.S. ex rel. Fowler v. Caremark RX, Inc.*,
No. CIV.A.03 C 8714, 2006 WL 3469537 (N.D. Ill. Nov. 30, 2006) .....................................21

*Gagnon v. Schickel*,
2012 IL App (1st) 120645.........................................................................................................29

*Green v. Morningstar, Inc.*,
No. 17 C 5652, 2018 WL 1378176 (N.D. Ill. Mar. 16, 2018)..................................................10

*Greenberger v. GEICO Gen. Ins. Co.*,
631 F.3d 392 (7th Cir. 2011) ....................................................................................................22

*H.J., Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989) ..................................................................................................................13

*In re Harley-Davidson Aftermarket Parts Marketing, Sales Practices, and
Antitrust Litig.*,
151 F.4th 922 (7th Cir. 2025) .....................................................................................................6

*Heartland Bank & Tr. Co. v. Ross Advert., Inc.*,
2012 IL App (3d) 100774-U......................................................................................................28

*Holding v. Cook*,
521 F. Supp. 2d 832 (C.D. Ill. 2007).........................................................................................19

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992)...................................................................................................................15

iii

*Humana, Inc. v. Indivior, Inc.*,
  2-20-cv-04602 (E.D. Pa. filed Sept. 18, 2020) ...........................................................16

*Humana, Inc. v. Indivior, Inc.*,
  No. 21-2573, 2022 WL 17718342 (3d Cir. Dec. 15, 2022)......................................17

*Humana, Inc. v. Indivior Inc.*,
  No. CV 20-4602, 2021 WL 3101593 (E.D. Pa. July 22, 2021 ...................................17

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ..............................................................................................15, 16

*Jennings v. Emry*,
  910 F.2d 1434 (7th Cir. 1990) .......................................................................................11

*Kazazian v. CNA Fin. Corp.*,
  2025 WL 3251424 (N.D. Ill. Nov. 21, 2025) ........................................................11, 13

*Lipin Enters., Inc. v. Lee*,
  803 F.2d 322 (7th Cir. 1986) .................................................................................18, 19

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) .................................................................................15, 16

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
  570 F.3d 849 (7th Cir. 2009) ..........................................................................................8

*Maryland Staffing Servs., Inc. v. Manpower, Inc.*,
  936 F. Supp. 1494 (E.D. Wis. 1996).............................................................................21

*McCauley v. City of Chicago*,
  671 F.3d 611 (7th Cir. 2011) ..........................................................................................8

*Menzies v. Seyfarth Shaw LLP*,
  197 F. Supp. 3d 1076 (N.D. Ill. 2016) ..........................................................................19

*Midwest Grinding Co. v. Spitz*,
  976 F.2d 1016 (7th Cir. 1992) .........................................................................................1

*Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*,
  No. 11 C 2231, 2012 WL 1886440 (N.D. Ill. May 22, 2012) ........................................8

*Northern Tr. Co. v. VIII South Michigan Assocs.*,
  657 N.E.2d 1095 (Ill. App. Ct. 1995)............................................................................27

*Okaya (U.S.A.), Inc. v. Denne Indus., Inc.*,
  No. 00 C 1203, 2000 WL 1727785 (N.D. Ill. Nov. 21, 2000).........................11, 12, 13

iv

*Olive Can Co. v. Martin*,
  906 F.2d 1147 (7th Cir. 1990) ............................................................................................ 19

*Orr v. Shicker*,
  147 F.4th 734 (7th Cir. 2025) ............................................................................................... 7

*Perlman v. Zell*,
  185 F.3d 850 (7th Cir. 1999) ........................................................................................ 21, 22

*In re Peregrine Financial Grp.*,
  487 B.R. 498 (Bankr. N.D. Ill. 2013) .................................................................................. 8

*Petri v. Gatlin*,
  997 F. Supp. 956 (N.D. Ill. 1997) ...................................................................................... 21

*Pratt Logistics, LLC v. United Transp., Inc.*,
  No. 2:21CV148-PPS/APR, 2021 WL 4335143 (N.D. Ind. Sep. 22, 2021) ............................ 11

*Richmond v. Nationwide Cassel L.P.*,
  52 F.3d 640 (7th Cir. 1995) .............................................................................................. 11

*Roofers' Unions Welfare Tr. Fund v. CaremarkPCS Health, LLC*,
  No. 1:26-cv-00162 (D. R.I. filed Mar. 18, 2026) .............................................................. 3

*Sears v. Likens*,
  912 F.2d 889 (7th Cir. 1990) ............................................................................................ 22

*Sedima, S.P.R.L., Inc. v. Imrex Co.*,
  473 U.S. 479 (1985) ........................................................................................................... 9

*Slaney v. Int'l Amateur Athletic Fed'n*,
  244 F.3d 580 (7th Cir. 2001) ............................................................................................ 20

*Stachon v. United Consumers Club, Inc.*,
  229 F.3d 673 (7th Cir. 2000) ........................................................................................ 12, 23

*Starfish Inv. Corp. v. Hansen*,
  370 F. Supp. 2d 759 (N.D. Ill. 2005) ................................................................................ 13

*In re Tepezza Mktg., Sales Pracs, and Prods. Liab. Litig.*,
  No. 23 C 3568, 2025 WL 81338 (N.D. Ill. Jan. 10, 2025) ................................................. 21

*Triumph Packaging Grp. v. Ward*,
  877 F. Supp. 2d 629 (N.D. Ill. 2012) ............................................................................... 7, 8

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.
Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) ........................................................................................ 10, 23

v

*U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*,
    911 F.2d 1261 (7th Cir. 1990) ....................................................................18, 19

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ....................................................................................23, 29

*United States v. Persico*,
    832 F.2d 705 (2d Cir. 1987) ...........................................................................14

*United States v. Reyes*,
    No. 2:11CR77 PPS, 2014 WL 12682287 (N.D. Ind. Jan. 15, 2014).........................11

*United States v. Turkette*,
    452 U.S. 576 (1981) ......................................................................................9

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
    20 F.3d 771 (7th Cir. 1994) ......................................................................22, 23

*Voyles v. Sandia Mortg. Corp.*,
    751 N.E.2d 1126 (2001)................................................................................27

## STATUTES

18 U.S.C. § 1343.............................................................................................7, 22

18 U.S.C. § 1961(5)............................................................................................13

18 U.S.C. § 1962(c).................................................................................7, 9, 14, 23

18 U.S.C. § 1962(d)..........................................................................................7, 23

## RULES

Fed. R. Civ. P. 9(b)......................................................................1, 4, 8, 20, 21, 22, 23

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 7

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Express Scripts, Inc. ("**ESI**" or "**Express Scripts**"), Evernorth Health Services ("**Evernorth**"), and The Cigna Group ("**Cigna**" and collectively, "**Defendants**"), respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Complaint filed by Plaintiff Plumbers' Welfare Fund, Local 130 U.A. ("**Plaintiff**").

## **INTRODUCTION**

Plaintiff asks this Court to find plausible that fourteen of the largest pharmaceutical manufacturers in the world independently and secretly decided to enter into separate criminal enterprises with Defendants to rig drug formularies. All of which went undetected by regulators worldwide until an "investigative" journalism outlet—with direct ties to Plaintiff's counsel—claimed to expose this vast criminal conspiracy. Plaintiff's theory is not plausible on its face. Strip away the racketeering label, and what remains is a contract dispute in which Plaintiff received every dollar it was owed under the contract. This "garden-variety business dispute" is not a civil RICO action, no matter how much Plaintiff tries to suggest otherwise. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992). As the Seventh Circuit has long recognized, RICO did not "federalize[] every state common-law cause of action available to remedy business deals gone sour." *Id.* This case is a prime example of why.

Express Scripts administers prescription drug benefits on behalf of health plans, employers, and unions, making medications safer and more affordable for tens of millions of Americans. One of the ways Express Scripts does so is by leveraging the buying volume of its clients to negotiate rebates and discounts from drug manufacturers on favorable terms that clients could not obtain on their own. Express Scripts does not hide this fact. Indeed, its contracts expressly inform clients that Express Scripts "contracts for Rebates and Manufacturer Administrative Fees … on its own

1

behalf." Express Scripts then passes the rebates it receives on to its clients, pursuant to terms specified in each client's individually negotiated contract.

Express Scripts is also one of several members of a "group purchasing organization" (or "**GPO**") named Ascent Health Services ("**Ascent**"). Ascent aggregates purchasing volume across multiple participants to drive even *deeper* discounts from drug manufacturers, which are likewise passed on to clients pursuant to contracted and agreed upon terms. Express Scripts discloses its participation— ██████████ —in a GPO in its client contracts.

Plaintiff is one such client, a third-party payor that contracted with Express Scripts for Pharmacy Benefit Management ("**PBM**") services. The agreement between Plaintiff and Express Scripts, amended multiple times, discloses that Express Scripts negotiates rebates and participates in a GPO "on its own behalf," and further provides that Express Scripts will pay Plaintiff the *greater of* "100% of the Rebates and Manufacturer Administrative Fees received by ESI," or certain guaranteed minimum amounts on qualifying claims. Plaintiff does not contend that Express Scripts failed to pay the "Rebates" and "Manufacturer Administrative Fees" that were "*received by ESI*," as required by the contract.

Instead, Plaintiff's theory is that its members overpaid for prescription drugs because Express Scripts favored higher-cost brand-name drugs over cheaper alternatives when creating formularies (the list of preferred drugs made available to clients' members). According to Plaintiff, Express Scripts did so in order to secure more (non-rebatable) drug manufacturer fees for (non-party) Ascent. This is wrong as a factual matter and fails as a legal one, too. Put simply: even if this were true (it is not), it does not breach the parties' contract. Plaintiff, not Express Scripts, selects its formulary. Whether Express Scripts "favored" rebatable brand drugs is

2

therefore irrelevant, because Plaintiff ultimately determines what drug is on, or off, that formulary. That is clear under the contract and there is no breach otherwise.

Plaintiff's attempt to repackage this standard commercial dispute as a federal racketeering case fares no better. According to Plaintiff, Express Scripts secretly colluded—simultaneously, separately, and continuously—with "nearly every major drug company" in the world, including: AbbVie, Amgen, AstraZeneca, Bayer, Bristol-Myers Squibb, Boehringer Ingelheim, Eli Lilly, Gilead, Johnson & Johnson, Merck, Novartis, Novo Nordisk, Pfizer, and Sanofi. These are not bit players. They are fourteen of the largest, most heavily regulated pharmaceutical companies in the world. All are publicly traded. All are subject to independent audits, SEC disclosure obligations, and the continued oversight of federal, state, and/or foreign regulators. Together, they account for the majority of the global pharmaceutical market. Yet Plaintiff asks this Court to find plausible that each of them—independently, without any common agreement or shared communication channel—decided to enter into separate criminal enterprises with Express Scripts, acting for a shared common purpose of racketeering. This is not plausible. This is a run-of-the-mill contract dispute that has been tortured and warped in an effort to create a RICO case.[1]

As a result, Plaintiff's RICO claim faces insurmountable structural problems. First and foremost, Plaintiff has not and cannot allege a RICO "enterprise" because the 14 alleged enterprises (which bear no relation to reality and are a fiction created entirely for this litigation) are not entities with an existence and purpose distinct from the alleged wrongdoing itself. Health

---

[1] Making Plaintiff's claims even less credible, the same Plaintiff's attorneys recently filed a copycat lawsuit against another large PBM (CaremarkPCS Health, LLC), alleging the same racketeering claims, based on the same "Formulary Manipulation Scheme," involving the same fourteen manufacturers. *See Roofers' Unions Welfare Tr. Fund v. CaremarkPCS Health, LLC*, No. 1:26-cv-00162 (D. R.I. filed Mar. 18, 2026), Dkt. 1 ¶¶ 4, 21–45.

3

care entities do not become criminal RICO enterprises merely by engaging in the standard, arms-length rebate negotiations that Plaintiff now challenges.

Second, there is no cognizable pattern of racketeering predicate acts alleged: the Complaint alleges a single scheme producing a single type of injury—reduced rebates under one contract—and the fact that multiple payments flowed from that arrangement does not transform it into the pattern of distinct criminal acts that RICO demands. Moreover, to the extent Plaintiff challenges predicate acts of fraud that it alleges led to higher drug prices paid by its members, Plaintiff is a third-party payor and lacks standing to pursue any such alleged injury under well-established RICO case law. Civil RICO claims against PBMs have repeatedly been dismissed for this reason.

Third, even if Plaintiff could allege an enterprise and a pattern, the predicate acts are not pleaded with the particularity Rule 9(b) demands. Plaintiff fails to identify the "who, what, when, where, and how" required, instead generally attributing fraud to all three Defendants collectively. Where Plaintiff does identify specific communications, they are not fraudulent misrepresentations but instead routine corporate statements and rebate reports that, at most, reflect a dispute over how the parties' contract should be interpreted.

The balance of the Complaint does not salvage what the breach of contract and RICO claims cannot carry. Plaintiff's implied covenant claim repackages its breach of contract allegations under a doctrine that Illinois law does not recognize as an independent cause of action where, as here, the contract's express terms govern the conduct at issue. Plaintiff's unjust enrichment claim likewise fails because Plaintiff cannot simultaneously assert a quasi-contract theory while asserting the existence of an applicable contract. Both claims against Cigna and Evernorth independently fail because the Complaint does not allege that either parent company took any material action separate and apart from the conduct of their subsidiary, Express Scripts.

4

**BACKGROUND**

Express Scripts provides pharmacy benefit management services to health plans, employers, unions, and government agencies. Compl. ¶¶ 1, 28. It is a wholly-owned subsidiary of Evernorth Health Services, which is a wholly-owned subsidiary of Cigna. Compl. ¶¶ 27–29. Plaintiff is a Chicago-based health and welfare fund, or "third-party payor," that contracted with Express Scripts to obtain PBM services. Compl. ¶¶ 25–26.

The economics of the PBM industry benefit from scale. By aggregating the purchasing volume of their clients, PBMs are able to negotiate larger rebates and discounts from drug manufacturers than their individual clients could obtain on their own. Compl. ¶¶ 52–53, 67. Express Scripts develops standard formularies, or lists of covered drugs, which its clients have the discretion to adopt or customize. Clinical appropriateness, not cost, is always Express Scripts' foremost consideration when developing formularies. Cost is only a consideration when multiple therapeutically equivalent drugs exist. In that case, Express Scripts leverages competition between the different manufacturers to obtain greater rebates because ESI considers which drug has the lowest net cost (after factoring in rebates) when evaluating which of these drugs to include or exclude on its standard formularies. Compl. ¶ 61. GPOs like Ascent operate on the same principle at a higher level of aggregation. Ascent was formed in 2019 and negotiates with manufacturers on behalf of its participants, pooling their collective volume to secure additional scale for those negotiations. Compl. ¶¶ 30, 84–85.

The relationship between Express Scripts and Plaintiff is controlled by the parties' Pharmacy Benefit Management Agreement ("PBM Agreement"), executed on July 6, 2011, as periodically amended (attached, with its Amendments, as Exhibit A). Effective January 1, 2019, the parties amended the PBM Agreement to require Express Scripts to "pay to [Plaintiff] an amount

5

equal to the greater of" either ▮▮▮ of the Rebates and Manufacturer Administrative Fees received by [Express Scripts]" or certain "guaranteed amounts." Ex. A at 81:[2];

> **1.1.** Subject to the conditions set forth in this Agreement, ESI will pay to Sponsor an amount equal to the greater of:
>
> a. ▮▮▮ of the Rebates and Manufacturer Administrative Fees received by ESI; or subject to Sponsor meeting the Plan design conditions identified in the table below, the following guaranteed amounts:

*See also* Compl. ¶ 9. These terms are defined by the PBM Agreement: "ESI" is "Express Scripts, Inc.," Ex. A at 71; "Rebates" are "retrospective formulary rebates that are paid to ESI pursuant to the terms of a formulary rebate contract negotiated independently by ESI and directly attributable to the utilization of certain Covered Drugs by Members," Ex. A at 39; and "Manufacturer Administrative Fees" are "those administrative fees paid by pharmaceutical manufacturers to, or otherwise retained by, ESI pursuant to a contract between ESI and the manufacturer and directly in connection with ESI's administering, invoicing, allocating and collecting the Rebates under the Rebate program," Ex. A at 3. The contract also expressly confirms that Express Scripts ▮▮▮ ▮▮▮ Ex. A at 52, 54, 83. The PBM Agreement therefore only requires Express Scripts to pay Plaintiff "Rebates" and "Manufacturer Administrative Fees" that are "received by ESI." Ex. A at 81.

---

[2] "Because the [contract] is referred to in the complaint and central to the plaintiffs' claims, we can consider it under the incorporation-by-reference doctrine." *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs., and Antitrust Litig.*, 151 F.4th 922, 926 (7th Cir. 2025) (citing *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012)). Defendants respectfully submit that, because the parties' contract (and its various amendments) are referred to throughout the Complaint and central to Plaintiff's allegations, the Court may consider the PBM Agreement in assessing Defendants' Motion.

The amendments to the PBM Agreement variously refer to the underlying contract as both the "October 1, 2009" and "July 6, 2011" contract. Both dates refer to the same original contract; July 6, 2011 is the date the contract was executed, and October 1, 2009 is the date identified in the "Term" section. *See* Ex. A at 9 (§ 6.1(a)); *id.* at 12 (signature page).

Plaintiff alleges a breach of these terms, among other things, on behalf of a putative class of all Express Scripts' PBM customers during the period from April 15, 2019, through the present. Compl. ¶ 210. The Complaint asserts five counts: a substantive Racketeering Influenced and Corrupt Organizations Act ("RICO") violation under 18 U.S.C. § 1962(c) (Count I); a RICO conspiracy under 18 U.S.C. § 1962(d) (Count II); breach of contract (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); and unjust enrichment (Count V). Compl. ¶¶ 217–68. The RICO counts are premised entirely on predicate acts of wire fraud, 18 U.S.C. § 1343, and allege that Defendants operated fourteen bilateral "association-in-fact" RICO enterprises—one for each of fourteen major drug companies—through which the alleged scheme was carried out. Compl. ¶¶ 220, 228. Plaintiff further alleges that "Defendants created, controlled, and operated bilateral association-in-fact RICO enterprises with nearly all major drug companies." Compl. ¶ 191. Defendants now move to dismiss all counts.

## LEGAL STANDARDS

**Rule 12(b)(6).** To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual material, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requirement applies to claims brought against each specific defendant. *Orr v. Shicker*, 147 F.4th 734, 741 (7th Cir. 2025) (internal citation and quotation omitted).

"To meet this plausibility standard, the complaint must … raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Triumph Packaging Grp. v. Ward*, 877 F. Supp. 2d 629, 637 (N.D. Ill. 2012) (citations omitted). That is why "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

7

Courts do not accept "legal conclusions and conclusory allegations merely reciting the elements of the claim," *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011), or factual allegations that are "wholly implausible and factually frivolous." *Chaney v. Extra Space Storage Inc.*, No. 19-CV-05858, 2022 WL 4234969, at *4 (N.D. Ill. Sept. 14, 2022), *aff'd*, No. 22-2747, 2023 WL 2609119 (7th Cir. Mar. 23, 2023) (citing *Atkins v. Sharpe*, 854 F. App'x 73, 75 (7th Cir. 2021)). Moreover, in a breach of contract action, if the language of the contract is inconsistent with the plaintiff's allegations, the terms of the contract, "fairly construed, must prevail over the averments differing therefrom." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 768 (N.D. Ill. 2019) (quoting *Foshee v. Daoust Constr. Co.*, 185 F.2d 23, 25 (7th Cir. 1950)).

"When a party moves to dismiss a complaint for failure to state a claim based on contract interpretation, courts examine whether or not the clear, unambiguous language of a contract contradicts the plaintiffs' allegations." *In re Peregrine Financial Grp.*, 487 B.R. 498, 504 (Bankr. N.D. Ill. 2013) (citing *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11-cv-2231, 2012 WL 1886440, at *12 (N.D. Ill. May 22, 2012)). "When the clear terms of a contract conflict with the plaintiffs' allegations in their complaint, the contract controls." *In re Peregrine*, 487 B.R. at 504.

**Rule 9(b).** Where, in a RICO action, the alleged predicate acts involve fraud, those allegations must also satisfy Rule 9(b)'s particularity requirement. *Triumph*, 877 F. Supp. 2d at 637. At a minimum, a plaintiff must describe the "who, what, when, where, and how" of the fraud in order to satisfy the particularity requirement. *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009).

**ARGUMENT**

**I.      PLAINTIFF FAILS TO STATE A PLAUSIBLE RICO CLAIM**

A civil RICO claim under Section 1962(c) requires a plaintiff to plausibly plead: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L., Inc. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The Complaint fails to satisfy three of these four elements. Plaintiff does not plausibly allege (A) a distinct and coherent enterprise, (B) an adequate pattern, or (C) any qualifying racketeering activity.

**A.      Plaintiff Fails to Plausibly Allege a RICO Enterprise**

The enterprise element of civil RICO serves a critical gatekeeping function: it ensures that RICO reaches organized criminal conduct carried out through a distinct and identifiable business structure, not ordinary commercial relationships and disputes recast as racketeering. While the statute defines "enterprise" broadly to include "any union or group of individuals associated in fact," *United States v. Turkette*, 452 U.S. 576, 576 (1981), the case law makes clear that the enterprise must be an entity with an existence and purpose distinct from the alleged wrongdoing itself. The Supreme Court has held that an association-in-fact enterprise must have (1) a common purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 944–46 (2009).

For the purposes of this Complaint, Plaintiff has invented fourteen bilateral "PBM Fraud Enterprises," each a business relationship consisting of the Defendants and Ascent on one side and a drug company on the other. Compl. ¶¶ 192–96. But the Complaint does not identify an enterprise with a shared common purpose, nor one separate from the alleged "racketeering" that Plaintiff claims is occurring.

9

### 1. Plaintiff Fails to Plausibly Allege a Common Purpose

The Seventh Circuit has consistently held that a RICO enterprise must be something that exists with a shared purpose. *See, e.g.*, *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) ("RICO does not penalize parallel, uncoordinated fraud."); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) (A plaintiff must allege "a truly joint relationship where each individual entity acts in concert with the others to pursue a common interest."); *see also Green v. Morningstar, Inc.*, No. 17 C 5652, 2018 WL 1378176, at *5 (N.D. Ill. Mar. 16, 2018) ("The existence of a common goal or purpose is an 'essential ingredient' of an association-in-fact enterprise.") (quoting *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004)).

Plaintiff has not pleaded that Defendants, Ascent, and each of the fourteen drug manufacturers formed an enterprise with a shared purpose. *Boyle*, 556 U.S. at 942. Plaintiff has failed to plausibly allege *any* common purpose, because Plaintiff has instead alleged that Express Scripts, Ascent, and the drug manufacturers are conducting business with each other at arm's length. Plaintiff concedes that the supposed "Scheme" is orchestrated by "leveraging the negotiating power that Express Scripts has over drug companies." Compl. ¶ 8. This admission undercuts Plaintiff's enterprise theory: if the scheme succeeds because Express Scripts has leverage *over* manufacturers, then manufacturers are not willing participants in a shared criminal purpose—they are merely counterparties responding to alleged market power. That is not enough as a matter of law. *See, e.g.*, *United Food*, 719 F.3d at 855 ("RICO does not penalize parallel, uncoordinated fraud."); *Bible*, 799 F.3d at 655–56 (A plaintiff must allege "a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest."). At best, Plaintiff alleges "a run-of-the-mill-commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest[.]" *Bible*, 799 F.3d at 655–56.

### 2. Plaintiff Fails to Plausibly Allege an Enterprise Distinct from Racketeering

In addition, "[t]he enterprise must be separable from the pattern of racketeering activity." *Kazazian v. CNA Fin. Corp.*, No. 24-cv-10843, 2025 WL 3251424, at \*4 (N.D. Ill. Nov. 21, 2025) (quoting *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995)); *Pratt Logistics, LLC v. United Transp., Inc.*, No. 2:21CV148-PPS/APR, 2021 WL 4335143, at \*6 (N.D. Ind. Sep. 22, 2021) ("[A] RICO enterprise is an entity separate and apart from the pattern of racketeering in which it engages.") (citations omitted); *United States v. Reyes*, No. 2:11CR77 PPS, 2014 WL 12682287, at \*1 (N.D. Ind. Jan. 15, 2014) ("The existence of the enterprise itself is distinct from the acts constituting the racketeering activity."); *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) ("[A]lthough a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does."). Plaintiff's enterprise allegations fail this requirement because they are fully redundant of the legitimate business activities of the Defendants and the unnamed parties. Each of these fourteen alleged "Enterprises" is described in identical terms: the parties purportedly "associated" to "facilitate coverage determination, reimbursement, and rebate payments" and, in parallel, to "carry out an unlawful agreement to divert drug rebates, discounts, and fees from ESI PBM customers in return for favorable formulary placements." Compl. ¶¶ 196(a)–(n). But that is also precisely how Plaintiff describes the legitimate activities of the noncriminal business relationships between each of the fourteen drug manufacturers and Express Scripts. *See* Compl. ¶¶ 35 ("Bayer regularly interfaced with Express Scripts relating to coverage determination, reimbursement, and rebate payment."), 36–45 (similar).

These allegations therefore fail as a matter of law. *See Okaya (U.S.A.), Inc. v. Denne Indus., Inc.*, No. 00 C 1203, 2000 WL 1727785, at \*3 (N.D. Ill. Nov. 21, 2000) ("In order to satisfy the distinctness requirement, the RICO person must have committed the crime or fraud while

11

conducting the enterprise's affairs, not merely its own [legitimate] business."); *see also Browning v. Flexsteel Indus.*, 955 F. Supp. 2d 900, 912 (N.D. Ind. 2013) (finding no enterprise because the complaint contained no allegations as to how defendants coordinated to achieve predicate acts). Where a plaintiff can point only to an ordinary commercial relationship between the alleged enterprise's participants, the enterprise element is not satisfied because this is "consistent with the existence of a business partnership, not the prototypical RICO violation." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009); *see also Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) ("[T]he mere fact that [Defendant], for nearly 21 years, had business dealings with a wide assortment of unnamed manufacturers, wholesalers, and members in no way establishes that they function with [Defendant] as a continuing unit or as an ongoing structured [RICO] organization.").

*Okaya* is instructive. There, as here, every activity the plaintiff attributed to the alleged enterprise fell into one of two categories: the alleged racketeering activities themselves, or legitimate business activities that existed independently of any alleged wrongdoing. *Okaya*, 2000 WL 1727785, at *4. Because the plaintiff could not identify any coordinated activity in support of the alleged enterprise that was distinct from both the predicate acts and the defendants' ordinary business dealings, the court dismissed the claims for failure to explain "how Defendants' activities benefitted the group as an independent entity." *Id.* Plaintiff has the same problem here. The only activities Plaintiff identifies separate and apart from the alleged racketeering are coverage determinations, reimbursements, and rebate payment, Compl. ¶ 197, which Plaintiff elsewhere acknowledges are the standard features of any PBM-manufacturer relationship. *Id.* ¶¶ 52, 60. They are not actions of a fictional PBM-GPO-manufacturer "entity"; they are simply the ordinary

12

business transactions by which these separate entities interact. Like *Okaya*, the only thing Plaintiff claims the "enterprise" does as a group is to coordinate the alleged "racketeering."

Plaintiff is therefore left to define its enterprises by the alleged racketeering conduct itself. But "[a]n alleged pattern of racketeering activity does not by itself constitute an enterprise." *D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.,* No. 10 C 8159, 2013 WL 1286696, at *9 (N.D. Ill. Mar. 28, 2013); *see also Kazazian*, 2025 WL 3251424, at *4 (similar); *Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 770–71 (N.D. Ill. 2005) (dismissing complaint because it failed to plead enterprise based on allegations that "each member's role was to engage in the predicate acts underlying Starfish's RICO claims"). According to Plaintiff, each enterprise was formed so that "drug companies agreed to pay bribes and kickbacks" to Ascent "in return for access to Express Scripts' PBM customers through the drug formularies and favorable formulary placements." Compl. ¶ 191. In other words, the enterprises *are* the alleged scheme—the negotiation of manufacturer fees and rebates in connection with formulary placement decisions. Remove the alleged scheme, and nothing remains but the ordinary bilateral relationships between a PBM, its GPO, and the manufacturers with which they do business. There is no distinct enterprise.

### B. Plaintiff Fails to Plausibly Allege a Pattern of Racketeering Activity

Plaintiff's civil RICO claim separately fails because the alleged predicate acts do not constitute a "pattern of racketeering" activity within the meaning of 18 U.S.C. § 1961(5). To satisfy the pattern of racketeering requirement, "a plaintiff … must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original). It is not enough that such a pattern exists across the alleged enterprise; each individual defendant must have committed a pattern of predicate acts. *See Dudley Enters., Inc. v. Palmer Corp.*, 822 F. Supp. 496,

13

502 (N.D. Ill. 1993) ("In order to adequately state a § 1962(c) or (d) RICO claim, plaintiffs must allege that defendants engaged in a pattern of racketeering activity. This requires plaintiffs to establish that ***each individual defendant*** committed at least two predicate acts.") (emphasis added); *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise.").

Plaintiff's pattern allegations fail for two independent reasons: First, Plaintiff has not alleged that any of the named Defendants committed predicate acts that caused an injury it has standing to redress. Second, Plaintiff's pattern allegations fail because they improperly attempt to carve up what is a single alleged fraud into several predicate acts through wire payments.

### 1. Plaintiff does not allege Defendants engaged in a pattern of activity for the supposed Formulary Manipulation Scheme

The Complaint identifies two categories of alleged harm and asks the Court to treat them as a single, integrated fraud. They are not. The two injuries trace to different conduct and different actors: (1) the "Formulary Manipulation Scheme" "divert[s] exorbitant 'fees' to Ascent, which traditionally would have been considered rebates and passed on to Express Scripts' PBM customers," *see* Compl. ¶ 5; (2) the challenged conduct "drives up the cost of the drug benefit" that Plaintiff "provide[s] to [its] members and beneficiaries," *see* Compl. ¶¶ 61–62, 67. Pulling them apart—as RICO requires—reveals that Plaintiff has not one viable pattern theory, but two deficient ones.

The Complaint identifies six categories of alleged wire communications. Compl. ¶ 231(a)–(f). Three describe dealings between Ascent and drug manufacturers: communications "conditioning, negotiating, and confirming" fee payments to Ascent, *id.* ¶ 231(a); written agreements between Ascent and manufacturers concealing the "true purpose" of those payments,

14

*id.* ¶ 231(b); and payment communications relating to "purported 'rebate administration' and other fee payments to Ascent," *id.* ¶ 231(d). These are the predicate acts that correspond to Plaintiff's first theory of harm—the alleged diversion of rebates to Ascent. But none of this conduct is attributable to any named Defendant—Ascent is not a party to this case. And Express Scripts, Evernorth, and Cigna are not alleged to have sent any of these communications, negotiated any of these agreements, or received any of these payments. The predicate acts that supposedly caused the rebate shortfall were therefore allegedly committed by someone other than the Defendants.

### 2. Plaintiff does not have standing to pursue RICO claims for alleged overpayments

The remaining three categories describe communications between Express Scripts and its clients: PBM contracts that allegedly conceal "side agreements" with drug companies, *id.* ¶ 231(c); invoices and payment requests, *id.* ¶ 231(e); and marketing materials, proposals, and periodic reports regarding cost savings, *id.* ¶ 231(f). These are the only alleged predicate acts attributed to a named Defendant. But the injury they correspond to is not the rebate shortfall, but rather the allegedly inflated prescription drug costs. Plaintiff alleges that Express Scripts' misrepresentations about its formulary decisions caused Plaintiff to "pay more to Express Scripts during the Class Period for prescription drug coverage for their beneficiaries." Compl. ¶ 237. Plaintiff lacks standing to challenge these acts as an indirect purchaser under well-established RICO case law.

Section 1964(c) is modeled on the Clayton Act and is therefore subject to the same prudential limitations on standing that have evolved in antitrust jurisprudence. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 496 (7th Cir. 2002) (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–69 (1992)). Among those limitations is the *Illinois Brick* bar against suits brought by "indirect purchasers"—that is, participants in the supply chain whose injury derives from an overcharge passed through by another. *Loeb*, 306 F.3d at 480–81 (applying the *Illinois Brick*

15

analysis) (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729–30 (1977)); *Carter v. Berger*, 777 F.2d 1173, 1175–76 (7th Cir. 1985) (holding that the indirect purchaser rule articulated in *Illinois Brick* applies with equal force in the RICO context); *Fiala v. Wasco Sanitary Dist.*, No. 10 C 2895, 2012 WL 917851, at *7 (N.D. Ill. Mar. 16, 2012) (collecting cases). The relevant inquiry for the bar against indirect purchasers is not whether the plaintiff transacted directly with the defendant, but whether another entity absorbed the overcharge first and passed it downstream to the plaintiff. *Loeb*, 306 F.3d at 482 ("The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did *not* sell to them. Rather, it was because the defendants *did* sell to a third party who … could recover for any injury they claimed.") (emphasis in original). "[T]he chain-of-distribution inquiry in *Illinois Brick* was meant only to preclude duplicate recovery." *Id*. at 481.

Courts have analyzed this principle across a host of supply-chain contexts, including third-party payors like Plaintiff that have brought similar RICO claims. For example, in the *Humana* and *Centene* companion cases,[3] payors like Plaintiff brought civil RICO claims against a pair of drug manufacturers alleging a "scheme" that the manufacturer of the brand medication Suboxone conspired with another manufacturer to inflate the price of Suboxone. *Humana* Compl. (Dkt. No. 1) ¶¶ 45–46; *Centene* Compl. (Dkt. No. 1) ¶¶ 48–49, 213. Just like Plaintiff's allegations here, central to the payors' theory of injury was that the payors agreed to keep Suboxone on their formularies based on misrepresentations made by defendants—in their case, because of alleged misrepresentations about the drug's superior efficacy:

> [Payors] allege that defendants fraudulently induced them to include Suboxone film on their formularies, and thus defendants' scheme directly injured them. They allege that "driving formulary support for Suboxone film through payors—like the Insurers—was a key goal of the Suboxone Scheme because third-party payors like the Insurers were the ultimate source of defendants' profits." The Insurers claim

---

3  *Humana, Inc. v. Indivior, Inc.*, 2-20-cv-04602 (E.D. Pa. filed Sept. 18, 2020); *Centene Corp. v. Indivior, Inc.*, 2-20-cv-05014 (E.D. Pa. filed Sept. 21, 2020).

> that they "reasonably relied on defendants' statements and misrepresentations—not knowing they were false statements or misrepresentations—and included Suboxone film on their formularies."

*Humana, Inc. v. Indivior, Inc.*, No. 21-2573, 2022 WL 17718342, at \*2 (3d Cir. Dec. 15, 2022) (cleaned up).

Although the payors had alleged that the misrepresentations induced their conduct, that conduct was not the purchase of Suboxone—it was the *coverage* of Suboxone on the formulary, mirroring Plaintiff's allegations here. *Id.* Generally, payors *do not buy* prescription drugs directly from manufacturers; instead, manufacturers sell to wholesalers, wholesalers sell to pharmacies, pharmacies dispense to patients, and payors like Plaintiff reimburse for those prescriptions after the fact. *See Humana, Inc. v. Indivior Inc.*, No. CV 20-4602, 2021 WL 3101593, at \*11 (E.D. Pa. July 22, 2021) (observing that the complaints "seek recourse for damages from artificially inflated prices *paid by wholesalers* and *pharmacies* before physicians prescribed Suboxone and consumers made their purchases from those intermediaries") (emphasis added). Thus, the district court found that both payors were "indirect purchasers," and dismissed the RICO claims. *Id.* at \*12. The Third Circuit affirmed on appeal. *Humana*, 2022 WL 17718342, at \*1–2. In fact, the Third Circuit found that *by definition* a "third-party payor" is an indirect purchaser because their role is to *reimburse* for the cost of a drug paid by someone else. *Id.* at \*3.

The same reasoning applies here. While Plaintiff tries to sidestep *Humana* by naming its own PBM as the defendant rather than the manufacturers (named as non-party conspirators), the "Formulary Manipulation Scheme" at the heart of Plaintiff's allegations still focuses on Plaintiff's supposed overpayment for drugs. Compl. ¶ 5 (alleging the Formulary Manipulation Scheme is "driving up ESI PBM customers' prescription drug costs"); *id.* ¶¶ 76, 237 (alleging that as a result of "selling formulary access and favorable formulary placement to the highest bidder," "Defendants have raised ***prescription drug costs*** for Express Scripts' PBM customers.") (emphasis

17

added). Plaintiff's two-step is not enough. Those costs still reach Plaintiff only after multiple intermediaries in the supply chain have already purchased the drugs from the very manufacturers Plaintiff identifies as co-conspirators. That is precisely the posture the Third Circuit found dispositive in *Humana*: a third-party payor seeking redress for an overcharge absorbed and passed on by others. Plaintiff's decision not to plead the mechanics of that supply chain does not alter its position within it.

### 3. Plaintiff cannot establish continuity for either alleged predicate act

Plaintiff's supposed "Formulary Manipulation Scheme" separately fails the pattern requirement because the Complaint only alleges a single dispute concerning how formularies are created pursuant to the parties' time-limited contract. Compl. ¶ 6.

The Seventh Circuit has made clear that a plaintiff cannot manufacture a RICO claim from a single allegedly unlawful activity. For example, the court has repeatedly held that a plaintiff cannot sustain a RICO claim by repackaging the constituent transactions of a single alleged fraud as distinct predicate acts through creative pleading. *U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1268 (7th Cir. 1990) (finding the predicate acts factor unsatisfied when plaintiff merely alleges several allegations of mail fraud and wire fraud that "relate[] back to the extortion allegedly achieved by the [single] contract"); *Lipin Enters., Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring) ("Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts (here, the mailings) may be no indication of the requisite continuity of the underlying fraudulent activity."); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278 (7th Cir. 1989) (for wire fraud, "the number of offenses is only tangentially related to the underlying fraud"). Thus, if the predicate acts alleged reflect only wire fraud, the underlying fraud must

18

involve more than one discrete instance of deception—not multiple payments flowing from the same arrangement.

The Complaint is a textbook example of this prohibited single-fraud theory. Every allegation—every manufacturer payment, formulary decision, and allegedly misleading communication—flows from and collapses back into a single alleged fraud: the "Formulary Manipulation Scheme." This remains true no matter how many times Plaintiff restates it, and it simply cannot transform an isolated scheme into an ongoing pattern of racketeering activity within the meaning of the law. *U.S. Textiles*, 911 F.2d at 1268; *Lipin Enters.*, 803 F.2d at 325; *Ashland Oil*, 875 F.2d at 1278; *Menzies v. Seyfarth Shaw LLP,* 197 F. Supp. 3d 1076, 1100 (N.D. Ill. 2016) ("Contrary to Plaintiff's assertions, the mere 'multiplicity' of mailings or wire communications does not automatically translate into a pattern of racketeering activity"); *Holding v. Cook*, 521 F. Supp. 2d 832, 840 (C.D. Ill. 2007) ("The Seventh Circuit has repeatedly held that multiple instances of mail and wire fraud do not make out a RICO claim if those acts were in pursuit of a single and discrete underlying fraudulent scheme.").

Nor is there any concern that the single alleged scheme is open-ended. Unless Plaintiff and Express Scripts mutually choose to renew the contract, there cannot exist any threat of repetition or "continued criminal activity." *See, e.g., Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990) (because "the undisputed evidence" established "that the purpose of the allegedly fraudulent scheme was to pay Jacob Martin's loan[,] [t]he scheme…had a natural ending with no threat of continued criminal activity."). A business relationship governed by a contract with a limited term is the opposite of open-ended continuity.

19

### C. Plaintiff Fails to Allege Predicate Acts with Specificity

Even if Plaintiff could overcome the disconnect between its alleged predicate acts and its injuries, its RICO claims still fail because the predicate acts are not pleaded with the specificity Rule 9(b) requires and improperly lump together allegations against separate Defendants.

#### 1. Plaintiff does not allege predicate acts with the particularity required by Rule 9(b)

Plaintiff's RICO claims also fail because the alleged predicate acts are not pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Rule 9(b) "particularity" requirement means that a plaintiff must, at minimum, allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Specifically, the plaintiff must allege: (1) the identity of the person who made the misrepresentation; (2) the time of the misrepresentation; (3) the place of the misrepresentation; (4) the content of the misrepresentation; and (5) the method by which it was communicated to the plaintiff. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 599 (7th Cir. 2001). Plaintiff cannot satisfy these requirements.

The Complaint's predicate act allegations, Paragraphs 229 through 233, fail to satisfy Rule 9(b) because, rather than identifying specific fraudulent transmissions, they list generic categories of communications that allegedly occurred across all fourteen bilateral "PBM Fraud Enterprises" throughout the entire class period from 2019 to the present. Compl. ¶ 231(a)–(f). These categories do not identify who sent each communication, who received it, when it was sent, where it originated, or what specific fraudulent content it contained. *Id.* They instead generally describe the types of documents that characterize any ordinary PBM-manufacturer relationship, not specific

fraudulent transactions. *Id.* Courts in the Seventh Circuit have held that such categorical descriptions are insufficient. *In re Tepezza Mktg., Sales Pracs, and Prods. Liab. Litig.*, No. 23 C 3568, 2025 WL 81338, at *10 (N.D. Ill. Jan. 10, 2025) ("Plaintiff's allegations … are highly generalized … [s]uch allegations are insufficiently particular to satisfy Rule 9(b)"); *Petri v. Gatlin*, 997 F. Supp. 956, 983–84 (N.D. Ill. 1997) (dismissing RICO claims for failing to satisfy Rule 9(b)); *Maryland Staffing Servs., Inc. v. Manpower, Inc.*, 936 F. Supp. 1494, 1502 (E.D. Wis. 1996) (same); *U.S. ex rel. Fowler v. Caremark RX, Inc.*, No. CIV.A.03 C 8714, 2006 WL 3469537, at *6 (N.D. Ill. Nov. 30, 2006), *aff'd sub nom. U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730 (7th Cir. 2007) ("[w]ithout particularized allegations, plaintiffs cannot properly plead a fraudulent restock/resale scheme.").

The specifically identified communications, *see* Compl. ¶¶ 140–90, fare no better. The Complaint alleges, for instance, that the November 12, 2025, rebate statement was "misleading because Express Scripts failed to disclose that [Plaintiff] would have had a much higher rebate payment but for Defendants' diversion of monies to Ascent." *Id.* ¶ 189. But that is a fraud-by-omission theory, which requires pleading a specific duty to disclose. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 (7th Cir. 2009). No such duty is alleged here: the rebate allocation document reported the contractual rebate payment Plaintiff received for the relevant period, and the Complaint's only grievance is that the amount was lower than it should have been.

Finally, for the reasons discussed *supra* § I.B, the Complaint does not describe conduct that could constitute a pattern of wire fraud, the only predicate act identified by Plaintiff. Attempting to solve this problem, Plaintiff characterizes this conduct as wire fraud when it is, at bottom, a contract interpretation dispute. But the Seventh Circuit has repeatedly and consistently emphasized that an ordinary contract dispute may not be recast as fraud. *See Perlman v. Zell*, 185

F.3d 850, 853 (7th Cir. 1999) (RICO) (Easterbrook, J.); *see also Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 395 (7th Cir. 2011) (plaintiff may not "dress[] up [a contract claim] in the language of fraud" because fraud requires "something more than reformulated allegations of a contractual breach").

### 2. Evernorth and Cigna are improperly lumped together with ESI

In cases with multiple defendants, such as this one, the complaint must "inform each defendant of the nature of his alleged participation in the fraud" and "should inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (internal quotations omitted); *Emalfarb v. Seminole Hard Rock Digital, LLC*, No. 25 CV 12220, 2026 WL 215781, at *5 n.7 (N.D. Ill. Jan. 28, 2026) ("[F]ailure to differentiate between" defendants demonstrates "lack of particularity" under Rule 9(b)). The Seventh Circuit has consistently rejected RICO complaints that "lump[] together" multiple defendants without specifying each defendant's individual role. *Vicom*, 20 F.3d at 778 (citing *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)).

The Complaint names three Defendants—Cigna, Evernorth, and Express Scripts—but repeatedly attributes the alleged fraudulent communications to all three collectively, without identifying which defendant sent which communication, when, or to whom. *See, e.g.*, Compl. ¶ 229 ("Defendants Cigna, Express Scripts, and Evernorth directed each of the PBM Fraud Enterprises to engage in and affect interstate commerce"); *id.* ¶ 232 ("Defendants Cigna, Express Scripts, and Evernorth have regularly violated 18 U.S.C. § 1343"); *id.* ¶ 234 ("Defendants Cigna, Evernorth, and Express Scripts each knowingly and intentionally made or caused to be made the misrepresentations"). This group pleading is precisely what the Seventh Circuit has repeatedly found insufficient under Rule 9(b). *Vicom*, 20 F.3d at 778 ("[T]he complaint should inform each

22

defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant") (internal quotation omitted).

Cigna and Evernorth are particularly prejudiced by Plaintiff's generic allegations. The Complaint's narrative makes clear that it is *Express Scripts* that contracted with Plaintiff, sent Plaintiff rebate reports, and created standard formularies that Plaintiff could adopt. Compl. ¶¶ 77– 83, 187. Cigna is described primarily as Express Scripts' ultimate corporate parent, *id.* ¶ 27, and Evernorth as an intermediate holding company, *id.* ¶ 29. Yet the Complaint attributes to both of them, in undifferentiated fashion, the bulk of the communications alleged, contradicting its allegations elsewhere that Express Scripts was responsible for those actions. *See* Compl. ¶ 231(a)– (f). That is not permitted under the generous notice pleading standard articulated in Rule 8, much less the heightened standard under Rule 9(b). *See, e.g.*, *Sears*, 912 F.2d at 893 (affirming dismissal because the complaint "lumps all the defendants together and does not specify who was involved in what activity"). Moreover, "[i]t is a general principle of corporate law 'deeply ingrained in our economic and legal systems' that a parent corporation … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation omitted).

## II. PLAINTIFF FAILS TO PLAUSIBLY ALLEGE A RICO CONSPIRACY

The conspiracy count under § 1962(d) expressly incorporates and relies upon the same enterprise allegations as Count I. Compl. ¶ 238. The Seventh Circuit has held that where a complaint fails to plead facts establishing a § 1962(c) violation, it cannot state a § 1962(d) conspiracy claim "based on those same facts." *United Food & Com. Workers Unions v. Walgreen Co.*, 719 F.3d 849, 857 (7th Cir. 2013) (citing *Stachon*, 229 F.3d at 677). Because the enterprise element is not adequately pleaded, Count II likewise fails as a matter of law.

23

### III.     PLAINTIFF FAILS TO PLAUSIBLY ALLEGE A BREACH OF CONTRACT

Plaintiff alleges two breaches of the parties' operative PBM Agreement: (1) that Express Scripts violated a contractual commitment by considering compensation to its affiliated entities when making decisions for Plaintiff's formulary, Compl. ¶¶ 249–52; and (2) Express Scripts improperly misclassified rebates as "bona fide services fees" to avoid sharing them with Plaintiff. Compl. ¶¶ 253–56. Both theories fail as a matter of law.

The first theory fails because the parties' contract makes clear that Plaintiff—not Express Scripts—maintains ultimate control of its formulary, and Plaintiff therefore cannot plausibly allege that Express Scripts' formulary considerations caused it harm.

The second theory fails for two independent reasons. First, as Plaintiff itself alleges, the payments it seeks to recover flow from contracts between Ascent and drug manufacturers—not from contracts between Express Scripts and those manufacturers. Compl. ¶ 85. Plaintiff has failed to allege any term in the PBM Agreement that restricts how a separate (non-party) entity negotiates its own upstream arrangements with manufacturers, regardless of whether those arrangements may affect the downstream fees and rebates. Second, the more fundamental problem is that Plaintiff does not actually allege that Express Scripts failed to pay Plaintiff any amount that qualifies as a "Rebate" or "Manufacturer Administrative Fee" under the contract, and it has therefore failed to ground its contract claim in any term of the PBM Agreement.

### A.     Plaintiff's Formulary Placement Argument Contradicts the Parties' Contract

Plaintiff's first breach theory alleges that (a) Express Scripts "controls" Plaintiff's formulary (Compl. ¶¶ 3, 8) and (b) Express Scripts violated a contractual provision prohibiting it from considering "compensation derived through [affiliated] business segments" when deciding on "PBM formulary placement" (Compl. ¶ 6). But even accepting both as true for purposes of this

24

motion, the theory fails because it contradicts the express terms of the parties' contract. The PBM Agreement confirms that Plaintiff (not Express Scripts) "controls" formulary selection:



Ex. A at 10 (emphasis added). Because Plaintiff retained ultimate authority over formulary selection and management, Express Scripts' alleged consideration of affiliate compensation—even if true (they are not)—cannot be the cause of any harm to Plaintiff. Plaintiff chose its own formulary. Plaintiff's theory cannot, therefore, state a claim.

> **B.     Plaintiff's "bona fide services fees" Argument Cannot be Plausibly Alleged.**

Plaintiff's second breach theory is that Express Scripts "misclassif[ied]" manufacturer payments to Ascent as "bona fide service fees," rather than rebates, and that those fees should have been passed through as rebates to Plaintiff under the PBM Agreement. Compl. ¶¶ 253–56. The contract forecloses this theory for two independent reasons.

*First,* Plaintiff acknowledges that any supposed "recategorization" of rebates into fees is dictated by contracts between Ascent and manufacturers—not between Express Scripts and the Plaintiff. *See id.* ¶ 85. Nothing in the PBM Agreement restricts how Ascent (a non-party) structures its own contracts with manufacturers, let alone prevents it from re-contracting for additional fees rather than new rebates. Thus, even if Ascent did negotiate for higher fees at the expense of rebates (it did not), that conduct would not breach the parties' PBM Agreement. That contract entitles Plaintiff only to Rebates and Manufacturer Administrative Fees that are "received

by ESI" (or the applicable guaranteed amounts), not to amounts received by Ascent. *See* Ex. A at 81.

*Second,* the PBM Agreement expressly excludes the very category of payments Plaintiff seeks to recover, and the single conclusory sentence Plaintiff offers to plead around that exclusion falls well short of *Iqbal* and *Twombly*.

The operative contractual definition of "Rebates" is set out in the Second Amended PBM Agreement.

> "Rebates" mean retrospective formulary rebates that are paid to ESI pursuant to the terms of a formulary rebate contract negotiated independently by ESI and directly attributable to the utilization of certain Covered Drugs by Members. For sake of clarity, Rebates do not include, for example, Manufacturer Administrative Fees; product discounts or fees related to the procurement of prescription drug inventories by ESI Specialty Pharmacy or the Mail Service Pharmacy; fees received by ESI from pharmaceutical manufacturers for care management or other services provided in connection with the dispensing of products; or other fee-for-service arrangements whereby pharmaceutical manufacturers generally report the fees paid to ESI or its wholly-owned subsidiaries for services rendered as "bona fide service fees" pursuant to federal laws and regulations (collectively, "Other Pharma Revenue"). Such laws and regulations, as well as ESI's contracts with pharmaceutical manufacturers, generally prohibit ESI from sharing any such "bona fide service fees" earned by ESI, whether wholly or in part, with any ESI client.

Ex. A at 39. The "bona fide service" fees only refer to fees "paid to ESI or its wholly owned subsidiaries." Ascent is not Express Scripts' wholly-owned subsidiary—as Plaintiff admits, Ascent has multiple distinct co-owners. Compl. ¶ 30. Fees received by Ascent but not by Express Scripts fall outside the definition entirely. Even setting that aside, the definition contains an explicit carveout: separately categorized fees are not Rebates and thus are not shared with Plaintiff. Ex. A at 39.

Plaintiff's entire effort to overcome this contractual exclusion rests on a single sentence: the fees "far exceed the fair market value of any service that Ascent or Express Scripts provides to pharmaceutical manufacturers[.]" Compl. ¶ 255. That is a legal conclusion, not a factual allegation, and it is not entitled to the assumption of truth that *Iqbal* and *Twombly* reserve for well-pleaded facts. Accepting it would require the Court to assume: (1) what services Ascent actually

26

provided to drug manufacturers; (2) the market rate for those or comparable services; (3) the amounts Ascent actually charged; and (4) how those amounts compared to the relevant benchmark. The Complaint supplies none of these facts. It does not identify a single Ascent-manufacturer fee agreement. It does not specify what Ascent charged. It does not provide any comparator data, industry benchmarks, expert assessment, or any other factual basis from which the Court could evaluate the fair market value claim. Instead, it merely offers the conclusion that the fees "far exceed the fair market value." That is not enough, and makes clear that Plaintiff's ultimate complaint is dissatisfaction with its contractual terms. But Plaintiff's unhappiness does not transform Express Scripts' compliance with those clear contractual provisions into a breach.

## IV. PLAINTIFF CANNOT PLAUSIBLY ALLEGE A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Count IV of the Complaint should be dismissed. Under Illinois law—which the parties' contract specifies is the applicable law, Ex. A at 44—the implied covenant cannot serve as a vehicle to re-litigate conduct already governed by express contract terms.[4] Every act Plaintiff identifies in Count IV is either the same conduct alleged in Count III (breach of contract) or conduct that is already addressed by a specific contractual provision.

The implied covenant of good faith and fair dealing is not an independent cause of action in Illinois. The "covenant of good faith and fair dealing [is] a rule of construction, rather than an independent source of tort liability." *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1131–32 (2001). "Parties to a contract, however, are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract." *Northern Tr. Co. v. VIII South Michigan Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995)

---

[4] The PBM Agreement originally specified that Missouri law applied, but it was amended in 2016 to establish Illinois as the governing law. Ex. A at 44, 50.

(citations omitted); *see also Heartland Bank & Tr. Co. v. Ross Advert., Inc.*, 2012 IL App (3d) 100774-U, ¶ 42 (same).

The factual basis for Plaintiff's implied covenant claim is identical to its breach of contract allegations. In Count III, Plaintiff alleges that Express Scripts violated an express contract term— its promise that "[c]ompensation derived through [affiliated] business segments is not considered for PBM formulary placement" by diverting manufacturer payments to its affiliate Ascent in exchange for preferential formulary placements. *See* Compl. ¶¶ 6, 250–256. In Count IV, Plaintiff alleges that Express Scripts breached the implied covenant of good faith by doing the same thing: "giving favorable formulary placements for high-price, brand-name drugs in return for bribes and kickbacks from drug companies to its affiliate, Ascent," and "diverted those payments into Ascent's coffers." Compl. ¶¶ 259–60. Those are not distinct harms—they are the same alleged wrong, repackaged. Because Plaintiff's implied covenant claim is based on conduct governed by an express contract, it must be dismissed.

## V. PLAINTIFF CANNOT PLAUSIBLY ALLEGE THAT DEFENDANTS WERE UNJUSTLY ENRICHED

Count V should be dismissed because it is impermissibly duplicative of Plaintiff's breach-of-contract claim. First, Plaintiff's unjust enrichment claim against Express Scripts fails because Plaintiff alleges the existence of a contract. Under Illinois law, "[u]njust enrichment is an equitable remedy based on a contract implied in law." *First Midwest Bank v. Cobo*, 2017 IL App (1st) 170872, ¶ 29. "Therefore, a party cannot state a claim for unjust enrichment where an express contract exists between the parties and concerns the same subject matter." *Id.*

Plaintiff's own pleading defeats this claim. Plaintiff's unjust enrichment claim expressly "realleges and incorporates" all prior allegations "in paragraphs 1 through 216 above" including

28

the existence and terms of the governing PBM Agreement between Plaintiff and Express Scripts. Compl. ¶¶ 77–83, 263.  That is fatal under Illinois law.

Plaintiff cannot salvage its unjust enrichment claim under a theory of alternative pleading. While a "plaintiff is permitted to plead a breach of contract in addition to unjust enrichment," that "theory is inapplicable where an express contract, oral or written, governs the parties' relationship."  *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 25 (citation omitted).  "Thus, although a plaintiff may plead claims alternatively based on express contract and an unjust enrichment, the unjust enrichment claim cannot include allegations of an express contract."  *Id.* But that is precisely what Plaintiff has done here, and it forecloses the claim.

Moreover, Plaintiff's unjust enrichment claim against Evernorth and Cigna also fails because Plaintiff has not properly alleged the elements against them.  To properly plead an unjust enrichment claim, the "plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *Id.* (internal quotation omitted).  In the six paragraphs of Plaintiff's unjust enrichment claim, Plaintiff makes no plausible allegations that Cigna and Evernorth retained any benefit, let alone one in violation of the fundamental principles of justice, equity, and good conscience.  At best, the Complaint gestures at parent-subsidiary liability, but that is insufficient as a matter of law.  *Bestfoods*, 524 U.S. at 61.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted.

29

April 28, 2026                          Respectfully submitted,

                                        /s/  Meghan A. McCaffrey
                                        Tyler C. Murray
                                        QUINN EMANUEL URQUHART
                                          & SULLIVAN, LLP
                                        191 N. Wacker Drive, Suite 2700
                                        Chicago, Illinois 60606
                                        tylermurray@quinnemanuel.com

                                        Michael Lyle
                                        Eric C. Lyttle (admitted *pro hac vice*)
                                        Meghan A. McCaffrey (admitted *pro hac vice*)
                                        Alec A. Levy (admitted *pro hac vice*)
                                        Samuel Johnson (admitted *pro hac vice*)
                                        Maia Livengood (admitted *pro hac vice*)
                                        QUINN EMANUEL URQUHART
                                          & SULLIVAN, LLP
                                        555 13th St., Suite 600
                                        Washington, DC 20004
                                        mikelyle@quinnemanuel.com
                                        ericlyttle@quinnemanuel.com
                                        meghanmccaffrey@quinnemanuel.com
                                        aleclevy@quinnemanuel.com
                                        samueljohnson@quinnemanuel.com
                                        maialivengood@quinnemanuel.com

                                        *Attorneys for Defendants*

30